FILED
U.S. DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT DISTRICT OF COLORADO
FOR THE DISTRICT OF COLORADO

'17 - CV - 02293

2017 SEP 21 PM 4: 51

Civil Action No. _____

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

Ronald L. Throupe & Xue Mao,

      Plaintiff,

v.

University of Denver, a Colorado Corporation, and
Barbara Jackson, individually; and
Glenn Mueller, individually, and
Marie Kline individually, and
Paul Olk, individually,

      Defendants.

---

## COMPLAINT

---

· Plaintiff, Ronald Lorenson Throupe and Xue Mao by themselves pursuant to District under 28 USCA title IX of the Education amendment of 1972, 20 U.S.C. & 1681 et seq. brings this action against Defendants: University of Denver, Barbara Jackson, Glenn Mueller, Marie Kline, Paul Olk, jointly and severally, as set forth below:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, Ronald Lorenson Throupe, was and is a professor at the University of Denver, with a principal street address of 944 Aztec Drive, Castle Rock, CO 80108.

2.    Plaintiff, Xue Mao, was a student at the University of Denver and is a real estate analyst, with a principle street address of 8331 South Valley Hwy, Englewood, CO 80122

2

3.      At all times material to the allegations herein, The University of Denver was 501 C3 Colorado company, with an address of 2199 S. University Blvd, Denver Colorado 80208.

4.      At all times material to the allegations herein, Defendant Barbara Jackson was the Department Chair of the Burns School of Real Estate and Construction Management in the Daniels College of Business, University of Denver and, upon information and belief, is a resident of the state of Colorado.

5.      At all times material to the allegations herein, Defendant Glenn Mueller was a professor of the Burns School of Real Estate and Construction Management in the Daniels College of Business, University of Denver and, upon information and belief, is a resident of the state of Colorado.

6.      At all times materials to the allegations herein, Defendant Marie Kline was an administrator in the Burns School of Real Estate and Construction Management, in the Daniels College of Business, University of Denver and upon information and belief is a resident of the state of Colorado.

7.      At all times materials to the allegations herein, Defendant Paul Olk was a professor and Associate Dean in the Daniels College of Business, University of Denver and upon information and belief is a resident of the state of Colorado.

Venue is proper in this District under 28 USCA title IX of the Education amendment of 1972, 20 U.S.C. & 1681 et seq. substantial part of the events or omissions giving rise to these claims occurred is situated, in this judicial district.

3

## GENERAL ALLEGATIONS

Each of the allegations below are, unless otherwise stated, hereby incorporated into each of the claims for relief set forth in this pleading.

### MISREPRESENTATIONS, OWNER'S RELIANCE, AND IMPROPER USE OF OWNER'S FUNDS

8. As early as September 2013, Burns School of Real Estate and Construction Management Director Dr. Barbara Jackson began an internal campaign to alienate and exclude Dr. Throupe from the administrative process. Professor Stephen Sewalk sent an email in November 2013 to Dr. Throupe in which he claimed to have had a conversation with Dr. Jackson where she revealed her intentions to push faculty out, including Dr. Throupe. Following Dr. Throupe's receipt of this letter, he went to Dean Charles "Chuck" Patti with the short form of the letter and showed it to him.   Dean Patti claimed Dr. Throupe could not trust the letter because, "it is Sewalk." Dr. Throupe responded, "Yeah, sure, a lawyer writes a lengthy outline in detail and has an hour plus conversation completely wrong, not possible." Dr. Throupe explained that if there was falsification of a document that long and distributed, Dr. Sewalk would have already been thrown out of the university for such an act by now.

9. Dr. Jackson confronted Dr. Throupe in his office a week after the Chuck Patti meeting in November 2013 and demanded to know if Dr. Throupe believed the letter's allegations. Dr.

10.         Throupe confirmed that he did believe the allegations contained in the letter as Dr. Sewalk was

11.         unlikely to lie about such serious and egregious matters.

4

12.     The substance of Dr. Sewalk's warnings came to fruition shortly thereafter when Dr. Throupe found himself left out from input on class assignments, the RE club, the Burns strategic plan which

13.     he previously chaired, major gift interaction, and other important decisions on which he previously

14.     had been included due to his status as a tenured professor. In one of the earlier examples, Dr. Throupe won an award with the American Real Estate Association in Spring 2014. He subsequently

15.     requested Franklin L. Burns School of Real Estate and Construction Management Assistant to the Director Ceci Smith to include the award in the Burns newsletter. However, despite representations

16.     that she would include the award, Ms. Smith did not mention the award anywhere in the newsletter.

17.     Another key incident occurred between March 2014 and July 2014 when the Daniels Globalization Task Force decided to move forward with obtaining part-time jobs for international

18.     students through H1 or J1 status upon the encouragement of Immigration Attorney Ken Sterns and

19.     International House and Student Services Head Dave Gowdey. Mr. Gowdey told the International Task Force in May 2014 and at a June 2, 2014, meeting that he could create J1 status in weeks upon

20.     the identification of a project.

21.     Globalization Task Force Head Tom Dowd organized a June 2, 2014, meeting to formalize the initiative and then asked in a follow-up email for a group of people, including department chairs, for

22.     a meeting with the Globalization Task Force to discuss sponsoring students that summer. Dr. Jackson, Marcy Cozzens, and Paull Olk were part of that email invitation on July 7, 2014, and July

23.     21, 2014.

24.     Following this, Dr. Throupe identified two projects on behalf of the DU Globalization Task Force. The specific projects had been discussed in the five previous years about becoming internal

25.     to DU and included a commercial valuation project for approximately seven or eight county assessors along the Front Range. The assessor project was conditioned on the branding of the DU

26.     logo and thus needed to operate as an in-house project. The project was resurrected in Spring 2014 after talks broke down previously on the matter of the logo. It was a project which Dr. Throupe had

27.     been working to make happen already for many years upon the assessors requesting a meeting to discuss DU performing the consulting.

28.     In addition, Dr. Throupe had been working on the Denver Metro apartment survey for several years following the untimely passing of Gordon Von Stroh. He and Gordon wanted to have the

29.     Burns School house the study as Mr. Von Stroh became less active. In fact, earlier talks with Marie Kline before Mr. Von Stroh's passing had resulted in an agreement to put results on the Burns

7

30.     website. Dr. Throupe was eventually successful in getting DU marketing to do a quarterly press release after he gained permission from Paul Olk. Ironically, most recently, the results were added to

31.     discussions on the new Burns website.

32.     Long before any spring initiative, the projects not only had monies associated with them, but the projects' sponsors also wanted DU branding. In other words, the projects needed to be brought into

33.     DU as a project or grant if the DU branding or otherwise was involved.

34.     Dr. Throupe asked Paul Olk during the winter of 2014 for guidance on what to do. He was directed to university grants who reviewed the circumstances and told Dr. Throupe that they did not

35.     need to see the project in detail and to keep them informed. Dr. Throupe on two occasions came to Dr. Jackson's office and told her he was trying to get a project as a grant inside because of the clients

36.     wanting a DU branding, specifically that he was attempting to determine what DU would charge for overhead (a sacrifice for the branding to the project budget).

37.     In June 2014, Dr. Throupe visited Daniels Senior Recruiting Specialist Marcy Cozzens to explain the projects and the client wishes. Dr. Throupe told Ms. Cozzens that he needed guidance on how

8

38.     to create a projects account and part-time pay to facilitate the Global Taskforce's goal. But much to Dr. Throupe's surprise (and chagrin), Ms. Cozzens accused Dr. Throupe of arranging the contract in

39.     order to give Ms. Mao a job. In an email to Dr. Throupe, Ms. Cozzens explicitly stated DU has "no job for Mao" and to use his outside company. Admittedly, Ms. Mao was the likely person to get

40.     part-time work on this specific project because she had been working on similar projects for up to two years prior. Dr. Throupe responded to this email on June 18, 2014, with a request for

41.     explanation and that her response was not what he had asked. There was never a reply.

42.     The end result was the assessors did not proceed with the project, as in the prior attempt, because of the branding desire. The apartment reports to this day are outside of DU, although

43.     Daniels issued a preliminary press release for publicity and claims it came from Daniels and

44.     Colorado Economics. The State Housing Department still desires the DU brand on the official research.

45.     Ms. Mao is a former student at the Burns School of Real Estate and Construction Management. At the time of her attendance, Ms. Mao was a Chinese citizen studying abroad in the United States.

9

46.     She was a MBA-RE and had worked at times as a GA for Dr. Throupe when enrolled in Fall 2012 and the Winter 2013 Quarter. She was adopted by Dr. Throupe on January 11, 2016.

47.     Following what seemed like one event after another, Dr. Throupe reported a hostile work environment to DU Human Resources Vice Chancellor Amy King on July 31, 2014. Prior to this,

48.     Dr. Jackson had sent an email on July 24, 2014, demanding a meeting on multiple topics and

49.     claiming she would not support him on any projects. Dr. Throupe sent an email to Provost Greg Kvistad, asking to talk, but Dr. Throupe never heard back. As time for the meeting neared, Dr.

50.     Throupe called Ms. King. Dr. Throupe told Ms. King the current scenario and meeting demand on multiple topics were an extension of hostile work and he will seek legal assistance if threatened

51.     again. No one from DU HR to Dr. Throupe's knowledge ever followed up on his report or investigated.

52.     After the call to Ms. King, the meeting request by Dr. Jackson was suddenly changed from one hour to one half-hour. When the meeting started, Dr. Jackson said she had only one question: was

10

53.     Dr. Throupe an employee of appraisal firm NVC? Dr. Jackson also negatively commented that Dr. Throupe had a LinkedIn site where his former students were congratulating him on his affiliation

54.     with NVC. Dr. Throupe confirmed that he was not a NVC employee and had no benefits or office.

55.     Dr. Throupe would not let Dr. Jackson get away with the short meeting after the email claiming she would not support him on projects and her harsh words about having a meeting. He pressed on

56.     the other issues as she starred at her screen, apparently playing stupid on email history. Dr. Throupe

57.     thought it was highly unusual that Dr. Jackson pointed out that Dr. Throupe paid the application feen1

58.     for   graduate         60.

admission for Ms. Mao 0F                61.     and that she would even care or want to

                                                know. But what stood

        59.

62.     out to Dr. Throupe in particular was Dr. Jackson's comment, "How old is Mao? When I was her age....." Ms. Mao was twenty-eight years old at the time, which is the average age of graduate

63.     students enrolled in the Burns School according to comments made at a faculty meeting several quarters later.

11

64.     In a meeting later that year, Paul Olk told Dr. Throupe that his affiliation with NVC was questionable. This is without any information other than hearsay, which of course, resulted in Dr.

65.     Throupe correcting him. Dr. Throupe explained at the time that his affiliation with NVC was about data access and helping students procure jobs with the company. Dr. Throupe reminded Dr. Olk

66.     that there are even letters to it in his tenure package about the matter. In fact, Dr. Throupe had previously been encouraged to do more outside work after the Dept. Chair position went to

67.     Jackson.

68.     However, Dr. Throupe left his affiliation with NVC since both sides were fearful of DU allegations going forward. In fact, part of the reason Dr. Throupe was recruited by DU was due to

69.     his industry experience and the assurance from the Dean's Office on hire that he could continue to

70.     do outside work for the reputation of himself and Daniels.

71.     In the spring of 2016, Daniels recognized Dr. Throupe with the Scholarship of Application award after Dr. Throupe nominated himself through another faculty member, contrary to an email

72.     from the Dean's Office announcing the nomination list. less than a month later, the Appraisal

73.     Institute recognized Dr. Throupe by awarding him and his co-authors the Armstrong Khan Award

74. for paper of the year. This year 2017, as in 2013, Dr. Throupe was again featured in the Daniels research magazine. Dr. Throupe had the highest point total for annual reviews within the

75. department and in the top group of the Daniels for multiple years. But Dr. Throupe was listed as "not of merit" on his sabbatical application demonstrating a lack of support. Even more concerning, Dr. Throupe has been consistently left off special salary bumps with the provost initiative for base

76. salary increases despite being a high performer and recognized as being in the top eight percent of all DU faculty at special dinners by the provost.

77. This non-recognition for the type of merit targeted for the pool has left him less-motivated. Over the course of time, Dr. Throupe has become discouraged and worn out and it has affected his

78. moral and does not get the same point totals in the merit system, but still high. Dr. Throupe has mentally given up and doesn't expect to ever get monies. It has affected Dr. Throupe in every aspect

79. of life at DU, self-worth, self-confidence, and self-esteem.

80. In April 2015, Associate Director of the International House Laura Bues encouraged Dr. Throupe to file a DU CARES report with Molly Hooker about Ms. Mao due to concerns he had at

81. the time about Ms. Mao's immigration status, her apparent depressed state, and her class absences.

14

82.     Dr. Throupe had been keeping Ms. Bues informed over a period of time of his concerns in his attempt to abide by DU "responsible party" requirements. Dr. Throupe met with Ms. Hooker in

83.     April 2015 after again speaking with Ms. Bues. Dr. Throupe agreed to the DU CARES meeting, although he felt it may not be well accepted by Ms. Mao.

84.     In the DU CARES meeting with Ms. Hooker in April 2015, Dr. Throupe reported that he and Ms. Mao had been the subject of rumors claiming they were engaged in romantic relations and other

85.     harassment which had been spread by Dr. Jackson and other DU staff. He openly told Ms. Hooker that Ms. Mao was close to the family after she graduated in 2013 and was concerned she was ruining her future.  To this day, contrary to anyone else, Dr. Throupe does not know the circumstances of what caused this breakdown. Ms. Mao has never discussed it with him, although he tried once and she shut down. He never said he was in fear of accusation of any form of harassment, especially sexual. Rather, Dr. Throupe was concerned with what appeared to be irrational behavior and an increasing number of class absences.

86.     The rumors about an improper, romantic relationship between the two began in earnest with the May 30, 2014, Burns School Gala when Dr. Throupe brought Ms. Mao as his guest. Ms. Mao was

87.     not a student at the time and Dr. Throupe's wife had refused to attend following Dr. Throupe's

15

88.     recent treatment by DU. Dr. Throupe told his wife he would bring Ms. Mao as a substitute.

89.     At the Gala, Dr. Throupe and Ms. Mao talked to a limited number of people as they walked across the Cable Center and then sat at their assigned table.  Dr. Throupe then heard Dr. Jackson ·

90.     from the podium speaking about new activities at Burns that he knew nothing about. Associate

91.     Dean Dan Connolly began asking him questions at the dining table, which of course he could not answer as he was hearing about the activities for the first time. It was then that Dr. Throupe realized

92.     Dr. Jackson had succeeded in isolating him just as implied from Dr. Sewalk's write-up. As Ms. Mao needed to leave early to meet her boyfriend and Dr. Throupe did not want to be there long to face

93.     potential fodder opportunities, the parties left once Dr. Throupe's presence was no longer needed. Dr. Throupe went over to tell Kay Zhang and Hanbo Li, former graduate students of his who were

94.     also attending and who he has also helped like Ms. Mao, that he was leaving. Ms. Mao and Dr. Throupe left without causing a scene and walked down the sidewalk toward the Ritchie Center as

95.     Dr. Throupe cried knowing he had been isolated by Dr. Jackson.

96.     The week following the May 30, 2014, Gala, Daniels Director of Business Operations Marie Kline asked Dr. Throupe to pay for Ms. Mao's dinner. A previous email stated all faculty could bring

97.     one guest. Dr. Throupe was the only faculty member asked to pay for a guest. Ms. Mao was not a

98.     student at the time and there were others who brought non-spouses. Moreover, Ms. Mao was the prior year's graduate student of the year and been featured in the Daniels magazine research focus in

99.     Fall 2013. She belonged at the Gala as much as anyone else.

100.    Later in August 2014, Burns Professor Mike Crean came to Dr. Throupe's office and said that he had heard rumors. The rumors in question were that Dr. Throupe and his wife had broken up

101.    and Dr. Throupe and Ms. Mao entered into a romantic relationship. Dr. Throupe sharply rebuked

102.    Professor Crean and reminded him that (1) he and his wife both considered Ms. Mao as extended family, and (2) Dr. Crean had seen the him and Ms. Mao many times working together. Dr.

103.    Throupe told Dr. Crean that this rumor was unfair and hurtful. Moreover, Dr. Crean was well-aware that the rumor had no credence as he personally knew both Dr. Throupe and Ms. Mao—Dr. Crean

104.    even wrote recommendation letters for Ms. Mao for her immigration applications.

105.     A year after the Gala, the rumors had still not died down. On April 16, 2015, at approximately 11:15 pm, Burns Professor Glenn Mueller was sitting at the Fort Myers Marriott bar with Dr.

106.     Jackson for the the national ARES meeting when he saw Dr. Throupe and approached him under

107.     the premise of wanting to reminisce. Dr. Mueller walked over to the Marriot lounge with Dr. Throupe and made casual statements that he helped get Dr. Throupe through the tenure process

108.     and that the only negative things he had ever heard about Dr. Throupe at DU were (1) Dr. Throupe and his wife were having troubles, and (2) Dr. Throupe and Ms. Mao were engaged in a romantic

109.     relationship. Dr. Throupe denied the relationship and explained that he and Ms. Mao were both tired of their relationship being misconstrued as romantic in nature. In fact, Dr. Throupe was so

110.     disgusted by Dr. Mueller's comments that he sent an email to Dr. Mueller the following morning as a follow-up.

111.     After a faculty meeting in May 2015, Professor Sewalk told Dr. Throupe that his wife asked him questions about Ms. Mao based on "hall talk" while his wife was around the Burns Department

112.     offices. The rumors were again brought up by Paul Olk in June 2016 who said a faculty member said that Dr. Throupe introduced Ms. Mao as his wife at the Burns Gala and acknowledged again most

113.     recently in a meeting this May 2017 by Paul Olk.

114.     **After the DU CARES meeting, Ms. Hooker proceeded to e-mail Ms. Mao's boyfriend to inquire if she and Dr. Throupe were engaged in romantic or sexual relations. Ms. Mao's**

115.     **boyfriend was not a DU student. This email was not made in conjunction with any Title IX**

116.     **investigation or within the parameters thereof.**

117.     Dr. Jackson received an email from Graduate Studies following Dr. Throupe's April 2015 DU CARES meeting. The email instructed Dr. Jackson to interview with Ms. Hooker based on

118.     "disturbing things" in which she was implicated during Dr. Throupe's DU CARES Report. In an

119.     email, Dr. Jackson demanded that Dr. Throupe debrief her about his conversation with Ms. Hooker. During the debriefing, Dr. Jackson inquired directly if Dr. Throupe had a physical relationship with

120.     Ms. Mao. Dr. Jackson then revealed that the following incidents over the last year were reported to her: (1) Dr. Throupe and Ms. Mao were close to each other in October 2014 while in the department office, (2) Dr. Throupe and Ms. Mao were seen in the

19

corner of coffee shops together, and (3) Dr. Throupe and Ms. Mao had walked down the hall

in Daniels arm-in-arm. Dr. Throupe

121.     affirmed nothing of the sort had happened and there was no improper relationship between him and Ms. Mao.

122.     Dr. Jackson never spoke to Dr. Throupe about her meeting with Ms. Hooker following this debriefing. Dr. Throupe sensed something was wrong and they would only come to fruition on May

123.     12, 2015, when he discover that , at some point between the DU CARES meeting, and May 12,

124.     2015, a Title IX Complaint was lodged against Dr. Throupe for an improper romantic relationship between him and Ms. Mao.

125.     On May 12, 2015, Dr. Throupe learned about the Title IX complaint alleging that Ms. Mao and Dr. Throupe were engaged in romantic relations when DU Campus Safety Investigator Michael

126.     Fetrow performed a wellness check on Ms. Mao and invited her to contact DU Title IX Compliance Officer Kathryn Grove. She was told they had a complaint as to a faculty member harassing her. She

127.     told Mr. Fetrow directly and Ms. Grove in email that (1) the allegations were not true, (2) she had nothing to file, and (3) her absences were due to her own issues.

128.     Dr. Throupe was upset and hurt by such rumors and allegations. The last time he had seen Ms. Mao was briefly in the hallway one time in April 2015. Following the filing of the Title IX

21

129.     complaint and seeing how upset and hurt Dr. Throupe acted, Jim Gullick,

Hanbo Li, and Yanming Qu all asked Dr. Throupe in May 2015 and June 2015 if he had slept

with Ms. Mao.  Dr. Throupe

130.     was visibly upset and of course denied the untrue allegation. They all said they

had to ask.

131.     As a result, Dr. Throupe resigned from the International Task Force on May

16, 2015, to avoid further rumors of impropriety or predatory behavior related to students from

China. Yanming Qu,

132.     in an uncanny, unsolicited email the same day Dr. Throupe resigned, said she

was ready to support

133.     him and go to the authorities about this unjust inquisition. Ms. Qu expanded

that Dr. Throupe is a person who cared for the international students at DU.

134.     The prior year, Yanming Qu wrote a letter to the then Dean Chris Riorden

when she saw Dr. Throupe might stop helping and being involved for the students because of

what looked to be going

135.     on with the department chair search. Again, Dr. Throupe's tenure letter is

specific as to him engaging the international students and also within the student letters for the

tenure package. His

136.     intentions were admirable and he tried to be a better teacher to the

international students by trying to learn how they interacted.

22

137.     Even though Ms. Mao explicitly denied the allegations, Ms. Grove and Eric Butler with the DÜ Title IX Office in late May 2015 requested that Dr. Throupe meet with them to discuss potential Title IX violations. Dr. Throupe met with Ms. Grove and Mr. Butler twice between June 2, 2015, and June 8, 2015. At the first meeting, Ms. Grove told Dr. Throupe that the Title IX office was looking into whether he committed a Title IX violation based on (false) allegations he was engaged in an intimate, romantic relationship with Ms. Mao and had previously said he feared Ms. Mao would bring sexual harassment claims against him. This claim is completely false and manufactured.

138.     Dr. Throupe neither stated that he feared Ms. Mao would bring sexual harassment claims against him nor engaged in an intimate, romantic relationship with Ms. Mao. Both Dr. Throupe and his wife

139.     had viewed Ms. Mao as someone in need, so much that they eventually adopted her in January 2016.

140.     Dr. Throupe reassured Ms. Grove and Mr. Butler of these facts at their first meeting. This first meeting was dictated by Eric Butler. At one point Ms. Grove needed a break to go review her notes

141.     and came back asking the three items Jackson had mentioned: (1) being close in Burns, (2) going to coffee shops together, and (3) walking arm-in- arm at Daniels. When Ms. Grove asked Dr. Throupe

142.   the same questions on the so-called occurrences Dr. Jackson had mentioned to Dr. Throupe, it was then Dr. Throupe realized this was a repeat of questions relayed from Dr. Jackson to Ms. Hooker.

143.   Dr. Throupe also told Ms. Grove and Mr. Butler at their first meeting about the continuing faculty rumors about him and Ms. Mao, including Professor Glenn Mueller's most recent comments

144.   at the 2015 ARES conference. At the end of the first meeting Dr. Throupe told Mr. Butler and Ms.

145.   Grove while they were all in the stairway, directly, that he felt (1) he is a whistle blower, (2) he is vulnerable, (3) needs to be moved, and (4) needs medical care. Ms. Grove instructed him to seek out

146.   Sara Childs (which Dr. Throupe did but could never work out a medical leave with pay to care for his family). Dr. Throupe did go to DU health consulting and was later referred to Kaiser after he

147.   had a panic attack prior to having to go to faculty meeting and a request for a separate meeting by Dr. Jackson.

148.   Dr. Throupe told both Ms. Grove and Mr. Butler during the June 2, 2015, meeting that it was a Title IX violation for Dr. Jackson to pull out these rumors six months later when it was convenient

24

149.     for her, thereby violating her "responsible party" duties to report the allegations of an intimate relationship between a student and professor. **Indeed, just months earlier, all DU staff and**

150.     **faculty had been required to watch a video created by Ms. Grove about mandatory Title IX procedures which confirmed this fact.**

151.     On June 3, 2015, Dr. Throupe emailed Ms. King at DU HR to have her confirm with Ms. Grove that he reported a hostile work environment to her on July 31, 2014.  Ms. King emailed Dr. Throupe

152.     on June 3, 2015, in response to his email asking that he confirm with Ms. Grove that he reported a hostile work environment to her on July 31, 2014. Ms. King refused and told Dr. Throupe to tell

153.     Ms. Grove himself about his previous report.

154.     Dr. Throupe met with Ms. Grove a second time on June 8, 2015, to address false allegations by Dr. Jackson that he and Ms. Mao are engaged in a romantic relationship and to edit the transcript of

155.     the prior meeting.  Mr. Butler was not at the second meeting as he was sick.

156.     On June 8, 2015, Dr. Throupe reviewed Mr. Butler's dictation and gave Ms. Grove counter information about the allegations. Dr. Throupe had to edit substantial amounts of information left

157.     out of his prior discussion of June 2, 2015 pertaining to what he disclosed about his treatment in the department.

158.     Dr. Throupe then had to answer to the allegation as to why he only helped one student.   This was an outrageous assumption as numerous international students had already vouched for Dr.

159.     Throupe's assistance over the years, including mentoring, finding jobs, and arranging immigration status through his business contacts.

160.     Dr. Throupe was also asked why Ms. Mao would not come in to speak with either Mr. Butler or Ms. Grove. Dr. Throupe explained that he had no idea what was going on in Ms. Mao's life other

161.     than a disdain for DU following these events. He even showed Ms. Grove the pejorative-filled response to his telling her of such an inquiry.  Dr. Throupe reminded Ms. Grove that she herself

162.     told Ms. Mao she was under no obligation to come speak with her and Ms. Mao relied on those representations.

163.     Ms. Grove inquired about how Dr. Throupe and Ms. Mao communicate. Dr. Throupe informed Ms. Grove that their fear of retaliation and unwarranted false allegations at DU extended to any email. Although, at that point they were not working together, if there was a software program needed on a laptop, they would put the laptop in a library locker and send a picture of the

26

164.     locker number. Suffice it to say, Dr. Throupe and Ms. Mao feared being seen together. The last time they had seen each other was once in the hall in April 2015.

165.     The meeting on June 8, 2015, ended with Ms. Grove telling Dr. Throupe she will continue their conversation and again edit the transcript from the last meeting for him to come in and review.  Dr.

166.     Throupe asked if the issues he had brought up would be investigated. Ms. Grove did not provide a

167.     clear answer, stating instead, "Let's get through this part first." Dr. Throupe would not hear back from DU Title IX office for the entire summer.

168.     During the summer of 2015, Dr. Throupe was left "hanging in the wind" as to the Title IX investigation and an expected return interview as confirmed by Ms. Grove at his June 8, 2015,

169.     meeting. A Burns faculty meeting was being proposed for the beginning of the academic year. In an email to faculty, Dr. Jackson suggested a date. In a separate email to Dr. Throupe only, Dr. Jackson

170.     said "our own 9/11 Ron." Dr. Throupe, who had lost friends in the buildings, felt threatened and sent the email to Paul Olk. He never received a response.

171.     When a later request came from Dr. Jackson for a meeting at the beginning of the fall, Dr. Throupe was a nervous wreck and sought care at Kaiser for it. Dr. Throupe also arranged a meeting

27

172.    with Greg Giese of DU HR at the suggestion of the Ombudsman. Dr. Throupe met Mr. Giese in Anderson Commons because he would not go to the HR floor and be seen. Dr. Throupe later

173.    emailed Mr. Geise about Ms. Mao being denied scholarship access by Marie Kline. Dr. Throupe confronted Mr. Geise in the library coffee line later in September 2015 because he had not

174.    responded. Mr. Giese at the time said, "Seems like all the HR floor have something going on with you." Dr. Throupe was under duress. Per the consult of Kaiser, he called in with panic attacks about

175.    having to go to meetings. When Dr. Throupe agreed and met Dr. Jackson in early September 2015, her first words were "So how are you and Mao?" Dr. Throupe said little in an attempt to end the

176.    meeting.

177.    When the rumors and isolation continued into the next year, Dr. Throupe reached out to the Ombudsman for help in how to approach the DU Title IX Office to find out what happened from

178.    the summer's investigation and his complaint about the rumors of an improper professor-student

179.    sexual relationship. He sent a request to Mr. Butler who responded that there was no investigation, but that Dr. Throupe's unit may have something to say. This was three months after Dr. Throupe

28

180.     was told by Ms. Grove he would be back for interviews and editing the transcript.

181.     Dr. Throupe would continue to try and find out exactly happened regarding the Title IX complaint and allegations of misconduct in the following months. After his inquiries and attempts, DU Title IX Coordinator and Office of Title IX Director Jean McAllister sent a letter to Dr. Throupe on March 25, 2016 ("March 25, 2016, Letter") whereby she claimed that the statement by Professor Glenn Mueller in April 2015 that "The only thing I heard about you is you and your wife had relationship problems and there was a rumor about you and a grad student" was outside the purview of the Title IX office and did not identify the source of the egregious allegations.

182.     In the March 25, 2016, Letter, Ms. McAllister also stated that it was her "understanding that [no investigation was initiated] was communicated to [Dr. Throupe] at the end of the June 8th meeting

183.     and that was again communicated to [Dr. Throupe] in writing on September 17, 2015, by Eric Butler." Ms. McAllister, likewise, claimed that after Dr. Throupe brought "Mao to a department

184.     dinner (date unknown) and were subsequently asked by Marie Kline how you planned to pay for her ticket to the event," was also outside the purview of Title IX. 1F

185.     2

186.     Ms. McAllister claimed that the issue of Ms. Mao not being "invited to an honors lunch and the administrative assistant in the department told you it was, "because of last spring"" was about

187.     "another party and there is no indication that her lack of invitation to the event was due to gender or

188.     race." Ms. McAllister stated that, if Ms. Mao "would like to raise a concern about her treatment by the Department, she is welcome to do so."

189.     Dr. Throupe and Ms. Mao experienced retaliation following these events and reports to DU employees and staff about the initial acts giving rise to Title IX violations and a hostile work

190.     environment. In Fall 2015, Ms. Mao returned to DU as a student only to find herself less than welcome. Ms. Mao was assigned a graduate assistant position in the Department of Accounting for

191.     Fall 2015. Later in the quarter, Ms. Mao became ill from a preexisting condition and missed two weeks of classes. She requested time to makeup her missed assistantship hours but received harsh

192.     words and a denial from her then-supervisor, Sharon Lassar. She was told by Ms. Lassar that "you have to be able to lift at least 10 pounds" and "I don't trust you."

193.     Initially, Ms. Lassar claimed Ms. Mao did not notify the department about her illness or communicate about her absences. Multiple emails disprove this claim, as well as an instance on

194.     October 14, 2015 when Dr. Throupe went to the Department of Accounting to inform Ms. Mao about a tax form. Ms. Mao had not arrived yet, but he saw Ms. Lassar in the hallway. There, he told

195.     Ms. Lassar personally that Ms. Mao had a lung condition which now was acting up and it could be debilitating. He verified he had witnessed the lung condition act up in the past.

196.     Ms. Lassar also sent an email to Dr. Sewalk asking him whether Ms. Mao had been attending his classes regularly. Dr. Sewalk confirmed Ms. Mao had been ill and missed class, but managed to keep

197.     up with her coursework.

198.     Ms. Mao was forced to jump through figurative hoops to prove her medical condition. But each time she presented evidence, Ms. Lassar somehow found it flawed or insufficient. After Ms. Mao

199.     had an attack and went to the floor of a coffee shop while studying with a friend, her friend

200.     submitted an affidavit that he had witnessed her condition and the terrifying effect. Again though, this was insufficient for Ms. Lassar. Ms. Mao even went to a critical care facility, but, by that time,

201.     the main attack had subsided and did not show on common x-ray.

202.     Ms. Mao continued to suffer a lack of breath and chest pain for weeks after. She was afraid to commute in to DU from Boulder and risk an attack on the commute. Ms. Mao eventually went back

203.     to China to secure and bring with her the cat scans made on her collapsed lung since no one

204.     "wanted" to believe her, she was just a "no-show."

205.     Dr. Throupe, being familiar with Ms. Mao's ailment through his mentorship of the young woman, attempted to report retaliation, discrimination, and Title IX violations to Global Task Force

206.     Member Dorothy Lechowicz-Edwards related to Ms. Mao's treatment by Ms. Lassar and other DU

207.     employees. In several emails on or around November 6, 2015, Dr. Throupe provided Ms.

32

208.    Lechowicz-Edwards with evidence that Ms. Mao has a chronic condition. He stated that he "get[s] the impression that Mao is not believed and then claimed not to be trusted as to intentions to work.

209.    Ms. Lechowicz-Edwards never did get back to Dr. Throupe. A month later when he returned from China and after Ms. Mao had also talked to her, Dr. Throupe went to ask why Ms. Lechowicz-

210.    Edwards had yet to respond when she had said within a few days. Ms. Lechowicz-Edwards simply

211.    said she could not help, although just weeks earlier in October 2015, she had said she could help him and Ms. Mao.

212.    Shortly thereafter, Dr. Throupe received an email requesting that he meet with the dean for an update on November 8, 2015. Dr. Throupe met with Paul Olk, Dean Chrite and Dr. Jackson in the

213.    deans' conference room. At the meeting, Dr. Throupe was formally reprimanded for advocating on behalf of Ms. Mao. Dr. Throupe was told that Ms. Mao must act on her own and he was acting

214.    outside acceptable professional bounds because of the appearance of impropriety based on the rumors of a relationship between the two. Dr. Throupe said he had no way to control or get Ms.

215.    Mao to do anything.

33

216.     This reprimand runs directly counter to the stated purpose of the DU

CARES program. The DU website describes the DU CARE program as an "outreach program

helps find solutions for

217.     students experiencing academic, social and crisis situations including mental

health concerns."

218.     University of Denver, PIONEERS CARE, (last accessed March 1,

2017).The website encourages faculty "**when working with students, try identifying signs

or stressors.** These signs may

219.     include but are not limited to: (1) Academic difficulty, (2) Difficulties with

family/home environment, (3) Difficulties with adjusting to the college experience, (4)

Excessive or unexplained

220.     absences, (5) Financial concerns, (6) Mental health issues, (7) **Physical

health issues,** (8) Relationship issues, (9) Self-harm concerns, (10) Unable to locate a student,

and (11) Witness to an

221.     incident." *Id.* (**emphasis** added).


222.     Elsewhere on the DU website, it states "[s]ometimes, we need help reaching

out to struggling DU students. This is when we call on our Partners in CARE—people on

campus who have formed

223.     close relationships with these students. University of Denver, Partners in

CARE (PIC),

224.     http://www.du.edu/studentlife/studentsupport/pioneers_care/partners.html

(last accessed August 1, 2017).

225.     There was factual misinformation said by Dr. Jackson during this meeting, but Dr. Throupe felt he could not respond to it because they would claim he was advocating for Ms. Mao.  This included

226.     Dr. Jackson claiming Ms. Mao (1) had missed 75% of classes in both courses, (2) had not made communication about a presentation for Professor Sessions' course, and (3) had not done any work.

227.     Dr. Throupe asked Dr. Jackson to leave the meeting and argued for Dean Chrite to stay as they were only fifteen minutes into a scheduled half hour meeting. Dr. Throupe said that he is the one

228.     living under rumor from DU incidents. Dean Chrite told Dr. Throupe at this meeting in front of Dr. Olk that he "knew nothing of rumors about Mao and Dr. Throupe." However, an earlier email from

229.     Eric Butler on September 17, 2015, claimed that, while there was no Title IX investigation, Dr. Throupe's "unit may have something to say." At a later meeting in June 2016, Dr. Olk confirmed

230.     that the unit knew about the allegations and Title IX complaint. The "unit' is the Daniels College of Business, which includes Dean Chrite.

231.     Because of missing classes due to her illness and the difficulty of catching up on her courses, Ms. Mao requested an incomplete for her courses just in case she could not catch up. However, Dr.

232.     Jackson individually contacted each of Ms. Mao's professors and argued that Ms. Mao's professors should deny her credit for the quarter and not grant her an incomplete. Dr. Jackson claimed Ms.

233.     Mao missed seventy-five percent of a class with Professor Steve Sessions and the majority of Dr.

234.     Sewalk's course. Dr. Jackson remained adamant on this point despite evidence to the contrary. Dr. Jackson also knew that Ms. Mao missed the first two weeks of Professor Session's class because she

235.     was not enrolled in that class until then because of the last minute denial of her independent study.

236.     Later, after Ms. Mao left Daniels, and Dr. Throupe was granted FERPA rights by Ms. Mao[3], Dr. Throupe and Ms. Mao sought help from the Ombudsman about the ability to use class time when not enrolled as part of the measurement to deny an incomplete. The Ombudsman agreed to look into it, but she never responded to any of emails or provided any finding.

237.     Although Ms. Mao did miss two weeks of school for her lung condition in the middle of the quarter and one day at the end of the quarter after the chest pain returned as she struggled to catch

238.     up on her work, the Burns School has made efforts and worked with students who had missed

36

239.    many, if not most classes without the same scrutiny and press for penalty as done to Ms. Mao.  This was even discussed at the June 2, 2017, faculty meeting pertaining to incompletes.

240.    Ms. Mao went to see Ms. Hooker in September 2015 about whether the first two weeks counted against her attendance. She was told by Ms. Hooker at that time that she was not eligible for an

241.    incomplete because the percentage of classes she missed was greater than forty percent at that time. Ms. Mao asked Ms. Hooker if the first two weeks counted against her. Ms. Hooker responded to

242.    Ms. Mao that she should have known.

243.    However, Ms. Mao enrolled late into Professor Sessions' class upon the advice of Dr. Jackson, who had become Ms. Mao's Burns School student advisor at the beginning of the quarter. On

244.    September 21, 2015, Dr. Jackson told Ms. Mao she could not take an independent study or real

245.    estate classes as they were under the old program requirements. Dr. Jackson did not warn Ms. Mao that the first two weeks which Ms. Mao did not and could not attend would be counted against Ms.

246.    Mao's attendance. Rather, Dr. Jackson assured Ms. Mao she would have no problems with the class schedule.

37

247.    **Indeed, Ms. Mao found out much later that Professor Sessions' class would not count toward graduation if Daniels continued to insist she follow the "new" Burns School Core,**

248.    **and not "old" program she entered under.**

249.    Ms. Mao's graduate program adviser, Kenny Metcalf, had previously told Ms. Mao for over a year that the real estate classes and her independent studies were acceptable as Ms. Mao would

250.    return to complete a MSRECM under the old program requirements. Every other student who had

251.    been at Daniels prior to that quarter had the option to use the prior program requirements to finish, not the new MSRECM  MBA requirements. This was another situation where Ms. Mao was treated

252.    differently from other students. Other students entering for the first time, such as Lin Huang, were allowed to request the old program requirements.  Another former Daniels student, Ken Puncerelli,

253.    also looked into rejoining to complete a MSRECM dual degree and was told he could not return under the old program requirements **only because** he was outside a five-year window on classes

254.    taken. Ms. Mao was not outside a five-year window on returning and was treated differently.

255.     Ms. Mao even reached out to Dr. Olk in September 2015 directly for assistance. Yet when she expressed her frustration with the double talk about degree requirements, Dr. Olk told her she could

256.     go elsewhere to school if she didn't like it. Dr. Olk would go on to later tell Dr. Throupe in the

257.     winter of 2016 that it was "better" that Ms. Mao was gone.

258.     Ms. Mao's being singled out by the DU administration did not end there though. On November 30, 2015, Dr. Jackson sent an email to Professor Stephen Sewalk asking that he provide her "with

259.     the grade spreadsheet identifying the exam grades, assignment grades, etc. and the evidence

260.     justifying the A grade" for Ms. Mao. She explained that "[b]ecause of her struggles in her other class--issues associated with her absenteeism, failure to complete work, show up for presentations,

261.     etc., I suspect that the A will appear as somewhat suspicious."

262.     Dr. Jackson's statements run counter to fact. Ms. Mao gave Professor Sessions notice of her relapse and that she may not make the presentation. Ms. Mao had previously asked Professor

263.     Sessions if there was anything she needed to do if this scenario unfolded, but Professor Sessions

264.    never responded (despite being required by Daniels policy to respond within twenty-four hours). Moreover, as verified by Ms. Mao's classmates, Ms. Mao made substantial contributions to the

265.    presentation. Ms. Mao also never missed the amount of classes being claimed by Dr. Jackson.

266.    Dr. Jackson went on to check Ms. Mao's grades in Professor Sewalk's class within twenty-four hours of his posting the grades. Ms. Mao was the only student in the courses for Professor Sewalk

267.    and Professor Sessions who received this level of scrutiny and interference from Dr. Jackson.

268.    Moreover, despite Dr. Jackson's statements about suspicious behavior, Ms. Mao historically received A's in her classes. Ms. Mao is a merit scholar of the Daniels College of Business contrary to

269.    the very reason Dr. Jackson questioning her grades that quarter.

270.    Ms. Mao received some of the higher scores in the class for the two objective tests given. For anything subjective, a different scenario unfolded. Ms. Mao found glaring errors, as well as huge

271.    discrepancies in grades compared with the average grades of the class, in Professor Sessions' grades

40

272.     for her Fall 2015 quarter class. When Ms. Mao requested Professor Session's explanations to those suspiciously low grades, Professor Sessions again failed to respond.

273.     Professor Sessions also made untruthful comments about Ms. Mao's paper, on which she received a score of fifty-percent. Professor Sessions' comments included "this is an old topic' and

274.     "Mao is not credible to write such a topic."

275.     **Prior to these comments, Ms. Mao had been working in this particular field for quite a while and had publications on similar topics in national journals. The Appraisal Institute**

276.     **had even selected her as "Candidate for Designation" for its highly regarded MAI**

277.     **designation based on this work. Ms. Mao was also part of the Daniels magazine feature with Dr. Throupe on published research in 2013 and a co-author of the paper of the year for the**

278.     **Institute and soon to be announced winner of the Armstrong Kahn award. Her paper topic was later approved for presentation at the ARES national meeting for the upcoming spring.**

279.     **The paper topic to this day is part of ongoing federal litigation on mining and real estate effects.**

41

280.     More importantly, Ms. Mao had specifically asked Professor Sessions about what real estate topic was okay and the reply was general.

281.     Ms. Mao saw her grades lowered within the canvas reporting system over a week after her grade was posted. She has retained screenshots of this as proof. Between the grading errors and a lack of

282.     response from Professor Sessions, Ms. Mao found herself forced to file a grade appeal to Professor

283.     Sessions and then Dr. Jackson. Ms. Mao specifically petitioned Dr. Jackson for an additional grade change, but Dr. Jackson questioned why she was protesting to her since Professor Session had

284.     changed the grade marginally. Despite Ms. Mao affirmatively stating she wanted the grade change appealed, Dr. Jackson never acted within the university rule of thirty days response time. Dr.

285.     Jackson then made excuses and factual inaccuracies as to the response by Professor Sessions. Ms. Mao then sent a request for grade appeal to Dr. Olk. Dr. Olk claimed a committee was set up and

286.     then responded, but said nothing capricious was found and the grade remained a "C."

287.     Dr. Jackson as Ms. Mao's advisor was also responsible for assigning a grade for an internship Ms. Mao enrolled for as a requirement for international students who work off campus for pay.

42

288.     This particular internship was with Wayne Hunsperger, MAI included research on cases for law

289.     firms. The cases included the Animas River Gold King Mine spill and a contaminated property in Weld County. These internships are loosely monitored and typically given an "A" grade. In fact, in a

290.     research meeting, Dr. Throupe heard other faculty discussing internships and that all get an "A."

291.     Dr. Jackson in a non-customary act for a zero internship, called Wayne Hunsperger to determine if Ms. Mao had actually worked. Mr. Hunsperger, who did not know Dr. Jackson, later called Dr.

292.     Throupe to ask what this was about. Dr. Throupe told him to call back and let Dr. Jackson know of

293.     the cases and research Ms. Mao was doing. Mr. Hunsperger later called Dr. Throupe back to let him know he had left a voice message to Dr. Jackson reporting on which the projects Ms. Mao was

294.     assigned.

295.     When protesting her grade assigned by Mr. Sessions, Ms. Mao also made Dr. Olk aware, in writing that Dr. Jackson had never assigned her a grade for the internship during the DU grading

296.     period. Ms. Mao explicitly stated that the internship was required for her immigration status and,

43

297.     after the events of the fall and failure of Dr. Jackson to address the grade

appeal within university rules, she considered it a retaliatory act.

298.     After the last faculty meeting of the year on June 2, 2017, Dr. Throupe went to

the Registrar to request a transcript copy on behalf of Ms. Mao for an immigration filing.

Although Dr. Throupe has

299.      FERPA rights given to him by Ms. Mao, the Registrar required he have Ms.

Mao call into the Registrar for an unofficial copy. It was then they discovered that Dr. Jackson

to this day has not

300.     assigned a grade to the internship. This is a year and a half after completion of

the 2015 Fall Quarter and warning to Paul Olk.

301.     Ms. Mao has not returned to DU to complete her degree due to fears of

additional retaliation and non-standard treatment. Ms. Mao left Daniels after the Fall 2015

Quarter for these reasons. She

302.     attempted to complete a degree at the Women's College but her health was

not good. By the time she switched colleges, she had lost significant weight and strength from

the stress of scrutiny. She

303.     was given a medical leave by DU health and not allowed to return until she

had a medical release. Dr. Throupe has encouraged Ms. Mao into physical therapy due to her

chronic headaches, fever,

304.     and lung conditions. Dr. Wally Umrah in Castle Rock treated Ms. Mao for over a year. While her fevers have lessened, the chronic headaches continue.  She has since started seeing Select Physical Therapy in Castle Rock, Colorado.

305.     On December 2, 2015, Dr. Throupe sent an email to Dr. Olk after reflecting on their earlier meeting in November 2015 where he was reprimanded. In his email, Dr. Throupe begins by stating

306.     that he "felt it was best to put down what I had to say and tell my story. I am concerned that there

307.     are some that make assumptions as to motives or otherwise and conclude someone is up to something, as illustrated in an email from Barbara Jackson to me, CC'd to you."

308.     Explaining that the following description of events was not to advocate but defend his thinking, Dr. Throupe went on to reiterate that he told Kenny Metcalf twice in July 2014, including once right

309.     in the hall outside of his department, that it looked like Ms. Mao was going to return to school the following quarter and would need to meet with him soon.  In August 2014 when Ms. Mao was

310.     reentering to complete the MSRECM, Dr. Throupe and Ms. Mao both sat down with Kenny Metcalf to go over the "do's and don'ts" and how many credits were needed for Ms. Mao to

45

311.     complete her degree. At the time, Kenny Metcalf told them that Ms. Mao needed thirty-five credits and there was room for specialized coursework, including independent study, if needed to combine

312.     with courses offered for the need to continue to make progress toward completion of a degree. There was no information presented on independent study, directed study, and internship being

313.     combined for a maximum credit amount, other than to say she had plenty of room to use independent studies as needed to stay full time and while completing the needed classes for credit

314.     and appraisal related needs.

315.     In September 2015 when Ms. Mao returned for fall classes, Dr. Throupe was no longer her advisor and suggested she go see her graduate adviser, Kenny Metcalf, to confirm what he had told

316.     them the year prior because she was approaching the required 35 credits. Ms. Mao confirmed she

317.     met with Kenny Metcalf following Dr. Throupe's encouragement and confirmed the hours to complete and eligibility for independent study. Later, Ms. Mao moved to Boulder and felt it would

318.     be best if she did not have to commute each day. Later because of the advisement to take the Sessions class, she in fact did have to commute from Boulder four days a week on the Boulder Bus

46

319.     returning late night after classes. A week later when hearing mixed information, Dr. Throupe again suggested that Ms. Mao go back to Kenny Metcalf and confirm what he had said. Kenny Metcalf,

320.     just as he had before, confirmed that Ms. Mao needed 35 credits and there were no issues with her schedule and she could tell others that information.

321.     When Ms. Mao was told on September 21, 2015, after classes began by Dr. Jackson that the independent study credits were not going to count, she again went to Kenny Metcalf on the same

322.     day. At this point, Kenny Metcalf said, "I made a mistake." Ms. Mao then tried to meet with Dr. Olk because there was conflicting info and high frustration on her part as to the different advice she was

323.     receiving. It was at this meeting that Dr. Olk told Ms. Mao she could go somewhere else if she didn't like what was happening.

324.     During the interim Dr. Throupe feeling threatened and accused of manipulation, Dr. Throupe went online with the Ombudsman to see if he could find anything about appropriate credits and all

325.     he found was a description of each category with a limit on independent study per degree. The DU website contained no mention of restrictions on directed study or the combination of credits for the

326.     two having a maximum.

47

327.     After a meeting with Paul Olk, who claimed Dr. Throupe was creating a degree for Ms. Mao, Dr. Throupe sent an email to Dr. Olk to clarify the motivations for the MSRECM add on to the MBA. He noted that the primary reason to complete what was thought to be a double degree was the need to complete the remaining real estate classes that would qualify toward appraisal credentials for the

328.     MAI along with federal and state requirements for license in Ms. Mao's career choice. The DU master program is certified by the Appraisal Qualification Board ("AQB") and the Appraisal

329.     Institute. The AQB requires all courses to be taken within a degree program for credit for the

330.     education required for licensure in appraisal. Therefore, it is an all or nothing proposition. If one of the courses is not completed at DU and not shown on the transcript, then there is no credit for the

331.     total group taken. Dr. Throupe stated that Dr. Olk could verify this with Mark Levine, a member of the Appraisal Standards Board. Dr. Throupe has never heard of Mark Levine being asked. What the

332.     MSRECM would also do is reinforce that Ms. Mao was in a "specialized" profession.

333.     The MSRECM program also qualifies students to become a "candidate for designation" for the MAI designation from the Appraisal Institute. Ms. Mao became a candidate and was awarded a

334.      national scholarship from the Appraisal Institute Education Trust in June 2015.

335.      Dr. Throupe also brought up comments made by Dr. Jackson in a prior email about the meeting involving his decision to go to graduate studies. Dr. Throupe pointed out that the comments were

336.      unnecessary and seemed to be provided for the purpose of tainting Dr. Olk's opinion of Dr. Throupe. Dr. Throupe explained that he debriefed Dr. Jackson prior to her meeting with graduate

337.      studies and he told her everything he said to them. Dr. Jackson did not seek out or talk to Dr. Throupe after she met with Molly Hooker. Dr. Throupe found no reason behind Dr. Jackson's

338.      statement that things about Dr. Throupe were "discovered" at the meeting with grad studies other than to taint Dr. Olk's opinion. Indeed, it was Dr. Throupe who initiated the reporting leading to a

339.      meeting with graduate studies.

340.      In summation, Dr. Throupe explained he had done nothing malicious or with an attempt to deceive. Rather, he followed and used the paperwork he and others have been using for nine years

341.      for independent study. Anything Dr. Throupe did was to continue progress toward completion of a

342.    degree and complete the classes required by the AQB while in the degree

program. Dr. Throupe is the MAI appraiser in his department. and it is only natural for those

who are working or training in

343.    this area to be interacting with him.

344.    Dr. Throupe also included that "it scares me to even communicate.  I do not

feel safe in my department which I told HR in June.  If there is a way to transfer me, I would be

willing."

345.    Later that same day, Dr. Olk wrote back the following:

346.    Thanks for sending this Ron. I appreciate it and wanted to hear all

of this directly from you.  Will add it to my information.

347.    My understanding from Kenny is that Xue Mao has enough credits

to graduate but the issue is not having the right ones, and that she needs to complete

specific courses

348.    to earn the degree. Also, I did track down from the Daniels' handbook

the following:

349.    Independent Studies or Internships – graduate students may not

exceed 10 hours total   for   independent   studies   and   internships   combined

(Independent

350.     Study/Internship

Registration Form)


351.     If other issues come up in the future, yes, let's talk directly.
However, let me reiterate the message in the letter given you during our meeting.
Regardless of your intent in the past to try to help Xue Mao out, going forward you
cannot employ her


352.     in University positions, internships, serve as her advisor, and/or teach
classes in which she is enrolled as a student.


353.     In response, Dr. Throupe pointed out that "there was more than one
opportunity to have been informed by the second floor advisement of the right ones." He also
noted that Dr. Olk "can

354.     confirm that I told Susan Harries at the beginning of last April to transfer her
away from me. I have

355.     done what was requested long before ever said directly." In his previous email
to Susan Harries, Dr. Throupe explained Ms. Mao was like family at that point (so much so he
eventually adopted her). He

356.     also questioned the "right ones" because Ms. Mao was eligible for the old
program and did not have to take any newly prescribed classes from the new program. Dr.
Throupe received no response to

51

357.     this fact. Also, a real estate elective course taken during the MBA could have been switched out and independent study credits/directed study already acquired during the MBA time could be used for

358.     the MBA degree review. This would have given Ms. Mao one more course completed for her second degree that is not independent study or directed study. Dr. Throupe, however, has since asked to not

359.     have to carry the majority load of independent studies or directed studies since he is not compensated for them and for fear of false accusations.

360.     The rumors of Dr. Throupe and Ms. Mao having an improper romantic relationship continued into 2016. On May 4, 2016, Dr. Sewalk informed Dr. Throupe that Professor Rick Leaman made a

361.     comment to him that the University of Denver would not do anything about Dr. Jackson's conduct until "they deal with [Dr. Sewalk] and Dr. Throupe." After hearing this, Dr. Throupe almost

362.     immediately sought out Professor Leaman. On May 6, 2016, Dr. Throupe told him that, unlike others at the university, he confronts others on hearsay.

363.     During their conversation, Professor Leaman stated, "Well Sharon, says this girl is a legal nightmare, that she could not do much and she could not fire her."  Professor Leaman then told Dr.

364.     Throupe that, unless he has influence in Washington, D.C., then Dr. Throupe should watch himself as DU has powerful relations with the government and other political influence in Denver.

365.     But only weeks prior in April 2016, Dr. Throupe had to witness Dr. Glenn Mueller at a Denver ARES conference happy hour come up from behind Ms. Mao and put his arms around her. Ms.

366.     Mao was a student at the Women's College at the time and Dr. Mueller placed his hand on her hip. Dr. Throupe immediately went straight to Dr. Mueller and asked him what he was doing. He stated

367.     Ms. Mao was now his daughter.   This scenario of Dr. Throupe witnessing other faculty members engage in misconduct of which he is accused but never face reprimand still has him break down to

368.     this day.

369.     On June 2, 2016, Dr. Throupe met with Dr. Olk and Dr. Jackson to discuss what he believed was a biased scheduling process and purposeful overscheduling of classes. He stated that he has

370.     taught classes for free in the past and his name has been listed in the course schedule for years as the

371.     professor assigned for independent study classes that may come up. He believed it was time for others to step up and oversee independent study or directed study scenarios because (1) there had

53

372.     been unjust backlash of Dr. Throupe teaching the independent studies for students who needed to find a class because of a lack of sections or competing course times at the students' expense, and (2)

373.     there were times where students were assigned to him on a directed study without his knowledge prior to the student informing him.

374.     At the June 2, 2016, meeting Dr. Olk agreed with Dr. Throupe that he was teaching too many classes and that his prep totals should not be more than four (even though that would still be above

375.     the Daniels average for faculty). Dr. Olk told Dr. Throupe at this meeting that Dr. Jackson would receive training on class distribution and assignment to faculty, so that faculty would have a voice in

376.     what they want and when to teach. Dr. Jackson reassured Dr. Olk that he would not teach more

377.     than four preps.

378.     Once Dr. Jackson was gone, Dr. Throupe immediately discussed the slight Dr. Jackson made at the end about an investment class. Dr. Throupe warned Dr. Olk that it is purposeful and will be an

379.     issue later. Prior to being dismissed from the meeting, Dr. Jackson made statements in front of Dr.

380.     Olk on June 2, 2016, that the staff reports all about Dr. Throupe to her.

54

381.   On the way to the parking lot on June 2, 2016, Dr. Olk openly stated that a faculty member had told him that Dr. Throupe had introduced Ms. Mao as his wife at the Burns Gala. Dr. Throupe

382.   asked him by who as he and Ms. Mao barely talked to anyone.

383.   In a follow up meeting a few days later, Dr. Olk asked him, "Why don't you just leave?" Dr. Throupe went on to explain that he was not upset with not being the chair, but how he has been

384.   treated ever since. He explained he only entered the chair search when the head of the search committee came to his office and asked him to join the pool, something Dr. Olk did not know. Dr.

385.   Olk also did not know that Dr. Throupe was recruited to phase in as department chair by a former Dean. Dr. Olk again did not know this and Dr. Throupe mentioned that the lack of knowledge

386.   transfer on the sixth floor is troubling.

387.   Not even three months later, Dr. Throupe sent a letter to Dr. Olk on August 25, 2016, stating that Dr. Throupe believed he had complied with the first step of the grievance process on June 2,

388.   2016, by meeting with both Dr. Olk and Dr. Jackson to discuss what he believed was a biased

389.     scheduling process and purposeful overscheduling of classes for him. Dr. Throupe repeated that the issues remained unaddressed and he had continuing concerns from the June 1, 2016, meeting. Dr.

390.     Olk never responded.

391.     On June 4, 2017, Dr. Throupe filed a formal grievance against Dr. Barbara Jackson in light of the failure of multiple conversations to remedy continuing issues stemming as far back as June 2016

392.     relating to her (1) failures to obtain faculty input in creating the course schedule, (2) potential

393.     favoritism, (3) overloading him with prep courses despite directions from Dean Olk to do otherwise,

394.     (4) assigning courses to faculty that are not in line with the faculty's credentials or experience,

395.     attempts to steer his upcoming courses to an agenda and (5) creating a work environment characterized by fear, retaliation and isolation.

396.     Dr. Throupe in his June 4, 2017, grievance also made explicit mention of an incident at a faculty meeting on June 2, 2017, in which Dr. Jackson verbally attacked and berated him in front of his

397.     peers and colleagues to apparently shame and humiliate him. During the Burns Faculty meeting, Dr. Throupe was asked by Jeff Engelstad if he minded trading with him a winter time slot to

56

398.     accommodate his desire to have time between classes to prep, hold office hours, and regroup prior to his next class. Dr. Throupe told Dr. Engelstad that he was fine with trading time slots. However,

399.     before Dr. Throupe could finish, Dr. Jackson interrupted in an angry voice, stating in front of all present that Dr. Throupe had insisted on his class sections be back to back and now he was acting

400.     to the contrary. Dr. Throupe responded that he knew nothing of such insistence. Dr. Jackson refused to let up on the point and said that she was leaving the meeting immediately to go get the paperwork from her desk.  Dr. Jackson left the meeting to go to her office per her word.

401.     While Dr. Jackson was out of the room, Dr. Throupe calmly said, for the record, that he prefers time between classes for the same reason, but not mornings and then afternoon if it can be avoided.

402.     Dr. Throupe doesn't demand time slots, but rather looks at the matrix and how it may affect

403.     students.

404.     When Dr. Jackson returned, she approached Dr. Throupe from behind and begun waiving a piece of paper near his head. Dr. Jackson proceeded to berate Dr. Throupe in front of the other

405.     faculty. Even so, Dr. Throupe calmly refused to engage. She eventually went back to her seat where

406.     she again started showing a piece of paper claiming Dr. Throupe had insisted on back to back sections.

407.     Following the advice of the Head of Student Conduct, Dr. Throupe, in a follow-up email to Dr. Olk on June 13, 2017, explained that Dr. Jackson had met with students in his classes suspected of

408.     cheating without his knowledge in Spring 2016 and potentially in March 2017. Dr. Throupe was concerned coaching may have been involved when they provided prepared responses that did not

409.     seem natural for students to be thinking in the midst of exchanging project information. And the general response Dr. Jackson duplicated from the previous year that students must not have

410.     understood. Dr. Throupe is submitting background information to Student Conduct as a file for future reference.

411.     **To make matters worse, just weeks prior to all of this on May 31, 2017, Dr. Glenn Mueller finally revealed to Dr. Throupe that Senior Director of External Relations Marie Kline had**

412.     **also promulgated several of the rumors at DU relating to a nonexistent intimate, romantic relationship between Dr. Throupe and Ms. Mao, including those about the Gala.**

413.     Dr. Jackson has taken it upon herself to micromanage Dr. Throupe, follow

him and Ms. Mao, and revealed her participation in the promulgation of rumors by DU

employees that they have

414.     engaged in an intimate relationship and that his assistance of her in Fall

2015 was motivated by his relationship with Ms. Mao. Such actions have in essence made it

impossible for Dr. Throupe to have

415.     any relationships or be comfortable in the department. Ms. Mao has been

hesitant to return to DU following the university's failure to rectify the rumors and what

appears to be, at best, reckless

416.     guidance and interference by Dr. Jackson and other DU employees to

single her out.


53.     Upon information and belief and on June 5, 2014, the receiver took possession of

AT's manufacturing facility.

54.      Upon information and belief, at the time the receiver initiated a hold on AT's

account in the early Summer of 2014, AT had only $29,945.00 in its general operating account.

55.     Upon information and belief, at the time the receiver was appointed in May of 2014,

AT had, *inter alia,* the following debts:

- $710,702.00 of debt to Western Alliance Bank;

- $210,075.08 of debt to AT's landlord;

- $211,742.69 of debt in warranty claims;

- $53,669.00 of debt for real estate taxes;

## FIRST CLAIM FOR RELIEF
### (Title IX violations and perpetuating and passing on allegations)

57.     Defendants, jointly and severally, gave or endorsed, ratified or approved, the giving of false information, and further jointly and severally failed to cause that information to be corrected, as more specifically set forth above, as to the relationship between the Plaintiffs.

58.     The Defendants misrepresentations and failure to correct or report the misrepresentations during an elongated period of time and had the ability to do so as responsible employees of the University of Denver.

59.     Defendants were negligent in obtaining, communicating or allowing the information given to be communicated to others and failing to correct the misrepresentations.

61.     The Defendants reliance on the misrepresentation of a relationship between the Plaintiffs led to further reputation damage to the plaintiffs.

60

## SECOND CLAIM FOR RELIEF
### (Failure to act under the Employee manual of the University of Denver)

62.     Defendants directly or through their endorsement, ratification or approval of the misrepresentations of an inappropriate relations of the Plaintiffs made false representations of a past or present fact.

63.     The misrepresented facts were material.

64.     At the time the representations described above were made, Defendants either knew the representations were false, or were aware that they did not know if the representations were true or false.

65. Defendants failed to report in a timely manner a concern of a inappropriate relationship as a responsible party of the University of Denver.

66. A failure to act as required and report in a timely manner led to further allegation and misrepresentation of the Plaintiffs.

## THIRD CLAIM FOR RELIEF
### (Failure to correct misrepresentation by University officials)

68.     Plaintiff notified University Officials (responsible parties) of the work environment and conditions at the Burns School on multiple occasions and levels of University Governance.

69.     University officials failed to act or investigate as required of their position under Title IX Guidelines.

## FOURTH CLAIM FOR RELIEF
### (retaliation)

74.     Defendants participated, as alleged more specifically above, to have retaliated against the Plaintiff who attempted to reporting Title IX violations.

75.     Defendants participated, as alleged more specifically above, withheld grades of the Plaintiff Xue Mao.

76.     Defendants mis advised Xue Mao on course selection and graduation requirements. When Xue Mao attempted to report she was told she could leave the University.

77.     Defendants formally reprimanded Ron Throupe for attempts to report retaliation and report problems related to DU Cares program,

78.     Defendants failed to cure reported retaliation of non-grade submittal.

79.     Defendants retaliated by not inviting Xue Mao to events because of "the spring" which was a legal and university approved withdrawal from classes for the spring quarter.

80.     The Defendants retaliated by changing grading requirements an unfairly treating Xue Mao different than other students.

81.     The Defendants retaliated by not complying with grade appeal procedure.

82.     The Defendant retaliated by giving other grad students the ability to take incompletes under similar or less viable circumstances than the standard Xue Mao was held to.

## FIFTH CLAIM FOR RELIEF
### (Violation of Colorado Consumer Protection Act)

85.     Defendant LeFevre knowingly engaged in deceptive practices by, *inter alia*, representing that AT's goods and services would be provided to Owner and/or its Contractor while

knowing that AT would not be able to provide its goods and services, which information was known prior to the entering into of the Subcontract and prior to the payment of Owner's Funds to AT, and by misrepresenting material information about how Owner's Funds were being used during a time when Owner had the ability to take action to recover its funds, with the intent that Owner would rely on Defendant's statements, representations and promises.

86.     Defendants NSDC and Liittschwager participated in the deceptive trade practices of Defendant LeFevre through their knowledge, endorsement, ratification, and/or approval of his representations.

87.     Defendants' deceptive trade practices occurred in the course of Defendants' business, vocation or occupation.

88.     Defendants' deceptive trade practices significantly affected the public as actual or potential consumers of AT's goods and services in that, upon information and belief, substantially similar representations to those described above were made to various other consumers, i.e., owners and contractors, who suffered losses as a direct result of their reliance on those misrepresentations.

89.     Owner was an actual consumer of AT's goods and services by being induced to authorize its Contractor to enter into a Subcontract with AT, and by authorizing disbursement of Owner's Funds to AT.

90.     Defendants' deceptive trade practices caused actual damages or losses to Owner.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)

91.     Defendants NSDC and Liittschwager, and non-party AT, agreed by knowledge, words and conduct to improperly use Owner's Funds for purposes other than the cost of producing

63

and delivering the agreed upon Windows and Doors; thereby, committing the offenses specified above.

92.     Defendants NSDC, Liittschwager, and LeFevre agreed, by knowledge, words and conduct, to misrepresent how Owner's Funds were being utilized, the financial solvency of AT, and to fail to correct those misrepresentations.

93.     Defendants committed the unlawful acts specified herein as a result of a common plan, scheme and design by non-party AT and Defendants to improperly use Owner's Funds for the payment of company expenses.

94.     Owner was damaged by Defendants' conduct.

95.     Defendants' are jointly and severally liable for Owner's damages.

## REQUEST FOR RELIEF

Plaintiff, Roanld L. Throupe and Xue Mao, demand judgment against Defendants, The University of Denver, Barbara Jackson, Glenn Mueller, Marie Kline, Paul Olk, jointly and severally, for compensatory damages, consequential damages, pre-judgment interest, court costs, attorney fees, pain and suffering, and such other and further relief the Court finds to be just and proper under the circumstances of this case.

Dated:  September 21, 2017

Ronald L. Throupe & Xue Mao _____
944 Aztec Drive
CASTLE ROCK CO 80108
Phone: (425) 681 6602
(303) 669 -8107
E-mail:rthroupe@gmail.com,
        xuemao24@outlook.com

Plaintiff's Address: