**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

**Civil Action No. 17-cv-02293-MSK-NRN**

**RONALD L. THOUPE,**

**Plaintiff,**

**v.**

**UNIVERSITY OF DENVER,**
**BARBARA JACKSON,**
**GLENN MUELLER,**
**MARIE KLINE, and**
**PAUL OLK,**

**Defendants.**

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Summary Judgment **(# 75)**, Mr. Thoupe's response **(# 81)**, and the Defendants' reply **(# 84)**.

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

Mr. Thoupe is a tenured professor of real estate at the University of Denver's ("DU") Burns School of Real Estate & Construction Management ("Burns School"). According to Mr. Thoupe, in 2013, when Defendant Barbara Jackson became Chair of the Burns School, she planned to eliminate the real estate section of the school and induce existing real estate professors – including Mr. Thoupe – to resign. Mr. Thoupe contends that Ms. Jackson intended to implement this strategy through various means including, among other things, assigning

increased and less-favorable teaching schedules to real estate professors and spreading rumors about such professors' alleged inappropriate behavior with students.

This case focuses on rumors that Mr. Thoupe had an inappropriate relationship with Xue Mao, a graduate student at the Burns School and Chinese national. Mr. Thoupe acknowledges that he has "a track record of helping Asian students at DU, who are largely Chinese, in their academic and professional endeavors," including sometimes offering students jobs or helping them with their immigration status. It appears that Mr. Thoupe met Ms. Xue in or about 2013 when she was a student in the Burns School's MBA program. For some period of time, Ms. Xue served as Mr. Thoupe's Graduate Assistant. After she graduated from the MBA program, Ms. Xue worked for entities owned by Mr. Thoupe and traveled with him on business trips or to attend conferences.

The record reflects that Mr. Thoupe and Ms. Xue also had a close, personal relationship. Mr. Thoupe admits that Ms. Xue frequently spent time at his house and with his family, and that "my family takes her skiing, water rafting, to the movies, [and] goes to dinner with Mao and her boyfriend." According to Stephen Sewalk, a close colleague of Mr. Thoupe's, Ms. Xue was "constantly at [Mr. Thoupe's] house and doing things with the wife and the children. . . [I]t's like a big family." The reference to Ms. Xue being "family" does not appear to be hyperbole: in or about mid-2015, it appears that Mr. Thoupe legally adopted Ms. Xue. Mr. Thoupe has spoken to others describing his relationship with Ms. Xue has having a "father-daughter" character to it.

The precipitating event for the rumors appears to have been a May 2014 gala held by the Burns School. Faculty members were allowed to bring a guest, and although most brought their spouses, Mr. Thoupe's wife decided not to attend. Mr. Thoupe invited Ms. Xue to attend the gala as his guest. This prompted discussion among officials at the Burns School, with there being

some debate over whether or not the Burns School would pay the cost of Ms. Xue's ticket for the gala. Marie Kline, a Burns School staffer, testified that she understood that the school "would pay for a [a] spouse or significant others if there was an event," but that she intended to charge Mr. Thoupe for Ms. Xue's ticket. She testified that, in response, Mr. Thoupe stated that Ms. Xue was his "significant other." Mr. Thoupe does not dispute having described Ms. Xue as his "significant other," but argues in his brief that he did so "jokingly and sarcastically . . . to underscore the absurdity of the inquiry."

It appears that, after the gala, rumors began to spread about a relationship between Mr. Thoupe and Ms. Xue. Mr. Sewalk testified that Defendant Glenn Mueller, another Burns School faculty member, "implied that . . . something is going on there." Michael Crean, another faculty member, testified more directly that both Mr. Mueller and Ms. Klein told him that Mr. Thoupe "was having an affair" with Ms. Xue. (Mr. Crean estimated that each told him this "a handful" of times. Mr. Crean testified that he would tell them they were "crazy" for believing it.) In 2016, Defendant Paul Olk, an Assistant Dean, told Mr. Thoupe that "at a faculty retreat," a staff member mentioned "that she heard that [Mr. Thoupe] . . . introduced [Ms. Xue] as [ ] his wife at [the gala]." There were also rumors spread from unidentified sources that Mr. Thoupe had been seen holding hands with Ms. Xue or otherwise showing physical affection towards Ms. Xue in office settings. (Mr. Sewalk believed that he might have heard this rumor from Ms. Kline, but conceded that it "could have been one of the other secretaries" who mentioned it.)

In April 2015, Mr. Thoupe called Laura Buhs, DU's Director of International Student Scholar Services. According to a written statement given by Mr. Thoupe some weeks later, he had made many attempts to contact Ms. Xue after March 2015, and that she was only "selectively responding" to him, asking about matters like a recommendation letter for her "but

Case No. 1:17-cv-02293-MSK-NRN Document 93-1 filed 02/26/20 USDC Colorado pg 4 of 22

not other things." Mr. Thoupe reported his concerns that Ms. Xue had stopped attending classes and had stopped showing up for her Graduate Assistant duties. Mr. Thoupe was concerned that DU might terminate her student status, thereby imperiling her immigration status. Mr. Thoupe also mentioned during this conversation that his relationship with Ms. Xue was "daughter-like."

Ms. Buhs became concerned that "the relationship that he was describing with the student surpassed the usual boundaries of what was acceptable between a student and faculty member." Ms. Buhs then arranged a meeting with Mr. Thoupe and Molly Hooker, DU's Director of Graduate Student Services. During that meeting, Mr. Thoupe mentioned several additional facts about his relationship with Ms. Xue that Ms. Buhs and Ms. Hooker found concerning - that one of his business entities had paid for some of Ms. Xue's tuition and was employing her at a rate of $100 per hour; that all of the classes she was enrolled in for the Spring quarter were taught by Mr. Thoupe; that he had helped her apply for a credit card and that she was on his family's cell phone plan (although he intended to terminate that latter arrangement); that he asked her to refer to him as her "step-dad," rather than her boss, when speaking to others "because he didn't want anyone to get the wrong idea about their relationship"; that he was intending to apply to legally adopt her; that when they went on business trips together, "the last day would be a day for 'making memories'," such as skiing together or going on sleigh rides; that he had observed that Ms. Xue can become "whacky" and undependable during her menstrual cycle; that Ms. Xue had met her current boyfriend at a graduate student happy hour that Mr. Thoupe had hosted, and that Mr. Thoupe was upset that he was being used as a "dating service"; and that, after Ms. Xue had limited her communications with him, Mr. Thoupe reached out to her friends to ask them why

she wasn't coming to work and frequented a coffee shop where Ms. Xue went with the hope of encountering her.[1]

Concerned that Mr. Thoupe's behavior towards Ms. Xue was improper (and perhaps had even created liability issues for DU were Ms. Xue to claim that Mr. Thoupe was harassing her), Ms. Hooker and Ms. Buhs reported their concerns to DU's Office of Equal Employment. DU's Title IX Investigator, Eric Butler, reached out to Ms. Xue, inviting her to have a meeting to discuss any potential concerns about her involvement with Mr. Thoupe. (Ms. Xue did not respond immediately, apparently due to a broken phone, and eventually responded in writing thanking DU for its concern and stating, simply, "I'm fine.")

Mr. Butler also contacted Mr. Thoupe to discuss the matter further. At a meeting on or about June 8, 2015 with Mr. Butler and Kathryn Grove, DU's Manager of Equal Employment, Mr. Thoupe expressed his belief that Ms. Jackson and other members of the Burns School staff were harassing him. He mentioned the dispute about his "significant other" comment around the time of the 2014 gala and that Mr. Crean mentioned to him in August 2014 that "everyone thinks that you and Mao are together"; his belief that he had not been treated fairly in 2013 when the Burns School selected Ms. Jackson over him as Chair; that "Mao and I don't feel safe in Burns anymore. We felt rumored. We can't even be ourselves"; that Mr. Mueller complained to Mr. Thoupe that "all I hear about is you and Mao"; and that, when Mr. Thoupe spoke to Ms. Xue about it, her response was "let's sue them, Ron. I'm sick of being hurt." A few days later, on

---

[1] Mr. Thoupe's own written statement about this meeting was apparently written in response to a written statement by Ms. Hooker, and disputes certain matters in Ms. Hooker's statement. The Court has omitted any matters that Mr. Thoupe disputes saying.

Case No. 1:17-cv-02293-MSK-NRN Document 93-1 filed 02/26/20 USDC Colorado pg 6 of 22

June 5, 2015, Mr. Thoupe e-mailed DU's Human Resources office, stating that he wanted to inform it that he believed he was the victim of a "hostile work environment."[2]

The situation flared up again in September 2015. Ms. Jackson became concerned that Ms. Xue had returned to campus and was going to undertake an independent study and internship under Mr. Thoupe's direction. Ms. Jackson inquired of DU's Human Resources Office whether it had advised Mr. Thoupe that he was not to have further faculty-student interaction with Ms. Xue. That office responded that Mr. Thoupe "raised harassment concerns but they were reviewed and did not rise to the level of a policy violation so were not investigated. No one from our office told [Mr. Thoupe] that he is not to engage with her."

On September 16, 2015, Mr. Thoupe wrote to Mr. Butler, asking about "the status of the concerns that were last discussed on June 8 with my visit." Mr. Butler responded that the June meeting "was strictly for the purpose of gathering your perspective on the information that we received" and that "it did not result in any formal investigation by the Office of Equal Opportunity." (Although both of these e-mails reference reviews or investigations, it is not clear to the Court whether they are referring to DU's investigation of its concerns as to whether Mr. Thoupe may have behaved inappropriately towards Ms. Xue, or whether they were referring to

---

[2] This e-mail exchange is somewhat difficult to parse without context. Mr. Thoupe sent it to Amy King, Vice Chancellor of Human Resources, with the intention that Ms. King pass the e-mail along to Ms. Grove. Mr. Thoupe's e-mail to Ms. King read "Amy, if you have not done so, I want you to let Kathryn Grove know that I informed you of a hostile work environment last July 31."

The reference to "July 31" appears to refer to a complaint Mr. Thoupe made to Ms. King in 2014. He complained to Ms. King that Ms. Jackson had refused to support certain projects that Mr. Thoupe was working to bring within the Burns School and that Ms. Jackson was critical of his association with one of his companies that he listed on his LinkedIn profile. Mr. Thoupe stated to Ms. King that this behavior "sets the background of how [Ms. Jackson] interprets me. She's always looking for the bad, not the good."

Ms. King responded that Mr. Thoupe's June 2015 e-mail that he should probably communicate that directly to Ms. Grove, to which Mr. Thoupe responded "ok, done."

Mr. Thoupe's complaints that he was being subjected to a hostile environment by Ms. Jackson and other Burns School officials. The Court will assume that both references address concerns about Mr. Thoupe's behavior towards Ms. Xue and that DU took no action whatsoever to address Mr. Thoupe's complaints that he was being harassed.)

On November 5, 2015, Defendant Paul Olk, DU's Associate Dean, wrote to Mr. Thoupe about the situation with Ms. Xue. Mr. Olk's letter acknowledged that "nothing [in DU's investigation about Mr. Thoupe's relationship with Ms. Xue] indicated the existence of a Consensual Sexual Relationship," but explained that certain language from DU's Consensual Sexual Relationship policy that was nevertheless pertinent, quoting text from that policy about how "relations between persons occupying [ ] asymmetrical positions of power, even when both consent, raise suspicions that the person in authority has violated standards of professional conduct," as well as perceptions of favoritism and concerns about the validity of consent given by the subordinate participant.[3] Mr. Olk also mentioned concerns about Ms. Xue's "excessive number of credits from independent study, [ ] her class attendance and her GA work," and that Mr. Thoupe "supervised Ms. Xue in almost all those units." Thus, Mr. Olk notified Mr. Thoupe that "the College is unable to allow you to continue your relationship with Ms. Xue related to her student status at this University. . . . [Y]ou cannot employ her in University positions, internships, serve as her advisor, and/or teach classes in which she is enrolled as a student."

Mr. Thoupe commenced this action *pro se* on September 21, 2017, and later retained counsel. His current operative pleading, drafted by counsel, is the Amended Complaint **(# 29)**, which asserts five causes of action: (i) "sexual and racial harassment" in violation of Title IX of

[3] Mr. Thoupe clearly takes umbrage with Mr. Olk's decision to quote the Consensual Sexual Relationship policy to him, even though Mr. Olk acknowledged that there was no evidence that Mr. Thoupe was involved in a sexual relationship with Ms. Xue.

the Education Amendments Act of 1972, 20 U.S.C. § 1681, asserted against Defendant DU; (ii) common-law defamation *per se* claim, presumably under Colorado law, against Ms. Jackson, Mr. Meuller, Ms. Kline, and Mr. Olk, in that they made defamatory statements that Mr. Thoupe had engaged in professional misconduct, and that he had engaged in an adulterous sexual relationship with Ms. Xue; (iii) a common-law defamation *per quod* claim, on essentially the same facts; (iv) a common-law claim, presumably under Colorado law, for intentional infliction of emotional distress against the same individuals, for essentially the same acts; and (v) a somewhat unclear claim for "respondeat superior" against DU, in that DU "is liable for the acts of its employees," namely, the individual Defendants.

The Defendants now move **(# 75)** for summary judgment on Mr. Thoupe's claims, arguing: (i) on his Title IX claim, because Mr. Thoupe cannot show that he experienced actionable harassment based on his sex and cannot show that DU was deliberately indifferent to that harassment, and to the extent he is alleging sex discrimination claims, cannot show that he suffered any adverse employment action because of his sex; (ii) as to the defamation claims, because he cannot establish that any defendant made a defamatory statement, cannot show that any defendant published such a statement, and cannot show special damages, and that the defendants are entitled to judgment on their affirmative defense of qualified privilege as to any such statements; (iii) as to the intentional infliction of emotional distress claim, he has not alleged timely conduct that is sufficiently outrageous.

## ANALYSIS

**A. Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Title IX claim**

Title IX provides, simply, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681.[4] Title IX claims premised on employment discrimination are evaluated according to the same standards as the equivalent Title VII claim. *Lee v. Univ of Colo.*, 313 Fed.Appx. 171, 177 (10th Cir. 2009). The precise contours of Mr. Thoupe's Title IX claim are somewhat unclear: he refers both to asserting a "sexual harassment" claim under Title IX, as well as what would appear to be a discrimination/disparate treatment claim. For purposes of comprehensiveness, the Court will consider each claim separately.

1. <u>Hostile environment</u>

To establish a claim that he was subjected to a sexually-hostile working environment, Mr. Thoupe must show: (i) that the workplace was permeated with intimidation, ridicule, or insult;

---

[4] It is clear that Title IX does not offer a remedy for racial harassment, and Mr. Thoupe's briefing does not attempt to defend such a claim.

(ii) that it was so severe or pervasive as to alter the terms and conditions of Mr. Thoupe's employment; (iii) that Mr. Thoupe was targeted for the harassment because of his sex; and (iv) that there is a basis for DU to be held liable for that conduct. *See Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012). Regarding the last element, it can sometimes be difficult to graft the liability principles of Title IX – which is primarily focused on ensuring the protection of <u>students</u> of an educational institution – to a more traditional employment-based framework. Thus, the "deliberate indifference" standard that applies in Title IX cases for student-on-student harassment, *see e.g. Davis v. Monroe County Board of Educ.*, 526 U.S. 629, 633 (1999), offers a poor template for determining whether DU should be held liable for what is, essentially, an employment-based decision. It may be more appropriate in cases such as this to adopt the employer liability principles of traditional employment-based sex harassment cases, such as *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). But, ultimately, for the reasons discussed below, Mr. Thoupe's hostile environment claim fails before he reaches the employer liability element.

The Court begins with the question of whether Mr. Thoupe can show that the harassment he suffered was "because of his sex." At the outset, Mr. Thoupe's response brief seems to defeat this theory on its very first page. There, Mr. Thoupe explains that the justification for the campaign against him was Ms. Jackson's "intention of significantly reducing the real estate portion of the school," by firing or chasing out real estate professors like Mr. Thoupe. By the second page of his brief, Mr. Thoupe acknowledges that he "ended up in the crosshairs because of this." Nothing in the record suggests that Ms. Jackson's decision to disfavor the real estate arm of the Burns School was based on sex – *e.g.* that the real estate professors were predominantly male, and that Ms. Jackson held an anti-male bias. Rather, Mr. Thoupe's own

theory makes clear that he was simply a victim of Ms. Jackson's differing vision of the Burns School's future academic focus. Thus, even if the Court were to conclude that there was evidence that anybody within the Burns School harassed Mr. Thoupe, and that DU allowed that harassment to continue, the record indicates that such harassment was because of Mr. Thoupe's academic focus, not his sex. For that reason alone, the Court would grant summary judgment to DU on Mr. Thoupe's hostile environment claim.

But carrying the analysis further, Mr. Thoupe contends that one form that the harassment took was the spreading of rumors that he and Ms. Xue were having an "affair" or were otherwise engaged in some form of inappropriate relationship. The record is fairly vague about the specific content of the rumors – Mr. Sewalk heard only that "something" was going on between Mr. Thoupe and Ms. Xue, and Mr. Crean heard talk of an "affair," apparently without elaboration about the nature of that affair. But in the interests of giving Mr. Thoupe the maximum benefit of the doubt, the Court will assume the most salacious possible character of the rumors: that they asserted that Mr. Thoupe was having an extra-marital sexual relationship with Ms. Xue. But gossip about a sexual affair between two individuals in the workplace, even if false and disseminated for purposes of harassment, is not necessarily "based on sex" for purposes of a hostile environment claim. By way of example, in *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996), the plaintiff was bedeviled by false rumors that he was having a sexual affair with a female subordinate. Although he denied the rumors and attempted to quash them, he was unsuccessful and eventually brought a hostile environment claim against the employer for allowing the rumors to persist. Rejecting the notion that the rumors constituted harassment based on the plaintiff's sex, the Seventh Circuit explained:

> There is not even a hint in the record that any rumors or vulgar statements concerning an illicit relationship between Pasqua and

> Vukanic were made because Pasqua was a male. By the very nature of such gossip, both Pasqua and Vukanic were made the subject matter [of the rumors], as evidence by Vukanic being the first to utter a threat to sue over the matter. Moreover, both men and women alike were talebearers. Such rumors spread, irrespective of truth, for any number of reasons having nothing to do with gender discrimination. In addition to what commonly motivates gossip of this type – a fascination with the prurient – perceptions of favoritism on Pasqua's part added fuel to the fire in this case. Although it is not inconceivable that someone might spread slanderous rumors in the workplace for the simple motivation that someone else was of a particular gender, this case, however, is not one of those rarities.

101 F.3d at 517 (emphasis in original). The 10th Circuit has noted its endorsement of this line of reasoning. *Duncan v. Manager, Dept. of Safety*, 397 F.3d 1300, 1312 (10th Cir. 2005) ("we doubt whether this letter [promulgating the rumor of a workplace affair] could support a claim for discriminatory hostile work environment. The letter critiques both Ms. Duncan and Chief Michaud for the alleged affair rather than singling out Ms. Duncan on the basis of her gender," citing *Pasqua*).

As in *Pasqua*, this record indicates that both Mr. Thoupe and Ms. Xue were equally targeted by the rumors of the alleged affair, and both their characters were called into question by those rumors. As in *Pasqua,* Mr. Thoupe's position of authority over and apparent favoritism shown towards Ms. Xue "added fuel to the fire," making the rumors even more potent. And yet, like in *Pasqua*, it is clear that the sting of the rumors was felt by both subjects, as it appears that it was Ms. Xue, not Mr. Thoupe, who was the first to suggest "let's sue them." Thus, nothing in the record suggests that whoever started or disseminated the rumors did so because of Mr. Thoupe's sex – that is, because he was a man as compared to a woman. Rather, by all appearances, the rumors were created and spread simply because they were consistent with (although perhaps not an accurate representation of) Mr. Thoupe's well-known and unusually

close relationship to Ms. Xue.[5]

Mr. Thoupe's briefing does not materially address the "based on sex" element of the hostile environment claim, except perhaps to quote portions of the deposition of Monica Reynoso, a Title IX Investigator at DU. Ms. Reynoso testified that "rumors about sexual activity" are things that could be "reportable" under DU's Title IX policies – that is, an employee who is aware of such rumors would be expected to report them to DU for further investigation. This is because, in some circumstances, such rumors "may be sexual harassment." But an assessment that DU's own Title IX policies makes such rumors "reportable" is not the same as the legal conclusion that such rumors are necessarily "based on sex" for purposes of a hostile environment claim when they are promulgated.

Thus, as in *Pasqua* and *Duncan*, this Court concludes that the rumors that circulated about Mr. Thoupe having an "affair" with Ms. Xue do not constitute harassment directed at Mr. Thoupe because of his sex. As a result, Mr. Thoupe cannot predicate a hostile environment claim on the circulation of such rumors. Without those rumors, the remainder of Mr. Thoupe's hostile environment claim crumbles. He alleges, for example, that Ms. Jackson assigned him to teach more difficult classes, but never alleges that she did so because of his sex (rather than because of his disfavored position as a real estate professor). He alleges that DU officials failed to investigate his own concerns that he was being sexually harassed, but it is clear that, like this Court, DU concluded that the rumors directed at Mr. Thoupe (and Ms. Xue) were not actionable

---

[5] Mr. Thoupe's June 2015 written statement mentions that his wife became embittered with the Burns School "because of how [he] was treated during the Department Chair search" in 2013 (when the school selected Ms. Jackson over Mr. Thoupe as Chair), and purposefully avoided the gala for that reason. Once again, although that is a perfectly reasonable explanation for her absence, Mr. Thoupe's wife's disengagement with Burns School events is another fact that, although construed incorrectly, would have lent credibility to more salacious rumors about Mr. Thoupe and Ms. Xue.

sexual harassment. Thus, even if DU failed to meaningfully investigate the matter entirely, it has no liability to Mr. Thoupe because Mr. Thoupe did not actually suffer actionable harassment.

Moreover, even if the Court were to assume that Mr. Thoupe could show that the rumors and other conduct were directed at him because of his sex – that is, because he is a man – the Court would still grant summary judgment to DU on his hostile environment claim because, as a matter of law, the rumors did not arise to the level of being sufficiently severe and pervasive as to alter the terms and conditions of his employment.

The conduct necessary to meet the threshold of a hostile working environment is considerable. Title VII "does not establish a general civility code for the workplace" and "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012). Few workplaces are free of base and salacious gossip about the participants therein, and rumors of vague sexual improprieties by co-workers are often the sort of uncouth-but-routine indignities that Title VII simply expects employees to tolerate. This is not to say that all lewd or salacious gossip avoids Title VII scrutiny, but even Mr. Thoupe's own characterizations of the rumors spread about read as insulting, yet fairly tame; that is, Mr. Thoupe does not allege that the rumors entailed graphic recitations of sexual activities or descriptions of the participants' genitalia, or otherwise contained particularly lewd or lascivious matter.

The Court recognizes that Mr. Thoupe had every right to feel appalled and ashamed upon hearing rumors that he was involved in a sexual relationship with a person he considered to be "like family," but the Court cannot say that, objectively such rumors are so severe and pervasive as to amount to actionable sexual harassment. The Court concedes that perhaps many professors

develop entirely platonic personal relationships with their graduate students, perhaps even sharing an occasional family meal or business trip with them. Far fewer, however, spend family holidays with their graduate students and pay their graduate students' cellphone bills and tuition. Fewer still describe themselves as their students' "step-dad" and legally adopt them. Once again, the Court fully credits Ms. Thoupe's characterization of their relationship as simply being like father and daughter. But the unusual nature of that relationship must reasonably be expected to foster some uncertainty and speculation among peers. Although the Court takes as true Mr. Thoupe's testimony that the rumors were offensive and emotionally painful to <u>him</u>, the severity inquiry has both objective and subjective components. *See Morris*, 666 F.3d at 664. The Court cannot say that, objectively, the rumors about him having an "affair" with Ms. Xue were so salacious and unfounded as to rise to the level of actionably severe and pervasive.

Accordingly, the Court finds that Mr. Thoupe has not demonstrated that he suffered a hostile working environment under the standards applicable to Title IX/Title VII. Thus, regardless of how DU may have responded to his complaints, it is entitled to summary judgment on his Title IX hostile environment claim.

2. <u>Disparate treatment</u>

With regard to Mr. Thoupe's sex discrimination claim, the Court need not recite the familiar *McDonnell-Douglas* analysis, as it is clear that Mr. Thoupe cannot establish a *prima facie* case that any adverse actions he suffered were based on his sex. As discussed above, Mr. Thoupe is adamant that he was mistreated by Ms. Jackson because he occupied a disfavored intellectual niche in her conception of the Burns School, not because he was male. The Court can assume, without necessarily finding, that Mr. Thoupe was given less-favorable teaching assignments and otherwise treated disrespectfully by Ms. Jackson. But Title IX is not a broad

guarantee that employees will be treated fairly and with respect in all aspects of their employment; it is pinpoint specific in seeking to eradicate mistreatment that is specifically based on the victim's sex. Here, because Mr. Thoupe has not alleged any facts that suggest that his sex was the factor that motivated Ms. Jacksons' alleged mistreatment, his claim for sex discrimination under Title IX fails.

Accordingly, DU is entitled to summary judgment on Mr. Thoupe's Title IX claim in its entirety.

**C. Remaining claims**

Upon the entry of judgment in favor of DU on Mr. Thoupe's Title IX claim, this Court loses its original subject-matter jurisdiction. The Court exercises only supplemental jurisdiction over Mr. Thoupe's defamation and outrageous conduct claims. As 28 U.S.C. § 1367(c)(3) explains, the Court may – "and usually should" -- decline to continue to exercise such supplemental jurisdiction once it has resolved all claims over which it has original jurisdiction. *Lucero v. Gordon*, 786 Fed.Appx. 833, 836-37 (10th Cir. 2019). Accordingly, the Court declines to consider Mr. Thoupe's defamation and outrageous conduct claims and dismisses them, without prejudice, for lack of subject-matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(# 75)** is **GRANTED IN PART**. The Court grants summary judgment to Defendant University of Denver on Mr. Thoupe's Title IX claim against it, and the Clerk of the Court shall enter judgment in favor of the University of Denver on that claim. The Court **DISMISSES**, without

Case No. 1:17-cv-02293-MSK-NRN Document 93-1 filed 02/26/20 USDC Colorado pg 18 of 22

prejudice, Mr. Thoupe's remaining claims for lack of subject-matter jurisdiction. The Clerk shall close this case.

Dated this 29th day of January, 2020.

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02293-MSK-NRN

RONALD L. THOUPE,

Plaintiff,

v.

UNIVERSITY OF DENVER,
BARBARA JACKSON,
GLENN MUELLER,
MARIE KLINE, and
PAUL OLK,

Defendants.

---

FINAL JUDGMENT

---

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Opinion and Order Granting Motion for Summary Judgment, filed January 29, 2020, by the Honorable Marcia S. Krieger, Senior United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendants, University of Denver, and against Plaintiff, Ronald L. Thoupe, on Defendants' Motion for Summary Judgment. It is further

ORDERED that the Court dismisses, without prejudice, Mr. Thoupe's remaining claims for lack of subject-matter jurisdiction. It is further

ORDERED that plaintiff's complaint and action are dismissed.

DATED at Denver, Colorado this 29th day of January, 2020.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK

*s/ Robert R. Keech*
Robert R. Keech,
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-CV-02293-MSK-MJW

RONALD L. THROUPE

Plaintiff,

v.

UNIVERSITY OF DENVER, a Colorado Corporation,
BARBARA JACKSON, individually,
GLENN MUELLER, individually,
MARIE KLINE, individually, and
PAUL OLK, individually,

Defendants.

---

**NOTICE OF APPEAL**

---

PLEASE TAKE NOTICE that plaintiff, Ronald L. Throupe, in the above-captioned action, hereby appeals to the United States Court of Appeals for the Tenth Circuit from: (a) the District Court's Final Judgment, dated January 29, 2020 (Dist. Dkt. # 90) closing the case and dismissing the action; (b) the District Court's Opinion and Order, dated January 29, 2020 (Dkt # 89), which granted the Defendants' motion for summary judgment, dismissing the Plaintiff's Second Amended Complaint and dismissing the action; and (c) each and every ruling and decision by the District Court related to the aforementioned Judgment, Decisions and Orders.

PLEASE TAKE FURTHER NOTICE that this appeal is taken from each and every adverse and related part of the Judgment and the Decisions and Orders as well as all such prior rulings by the District Court related to or made in connection with the aforementioned papers, including the rulings made leading up to the Judgment.

Dated: February 25, 2020

*/s/Cassandra M. Kirsch*
Cassandra M. Kirsch, #46502
LAW OFFICE OF CASSANDRA M. KIRSCH, LLC
600 17th Street, Ste. 2800-S
Denver, CO 80202
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2020, I served the foregoing **NOTICE OF APPEAL** on the following counsels of record via email:

Jim Goh
jgoh@ constangy.com

*/s/Cassandra M. Kirsch*
Cassandra M. Kirsch, #46502
LAW OFFICE OF CASSANDRA M. KIRSCH, LLC
600 17th Street, Ste. 2800-S
Denver, CO 80202
*Attorney for Plaintiff*