**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RONALD L. THROUPE,

Plaintiff - Appellant,

v.

UNIVERSITY OF DENVER; BARBARA JACKSON; GLENN MUELLER; MARIE KLINE; and PAUL OLK,

Defendants - Appellees.

No. 20-1069

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:17-CV-02293-MSK-NRN)**

---

Nathaniel B. Smith, Law Office of Nathaniel B. Smith, New York, New York, for Appellant.

Jim Goh (Renee J. Seyko with him on the brief), Constancy, Brooks, Smith & Prophete, LLP, Denver, Colorado, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BACHARACH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Ronald Throupe, a Professor of Real Estate at the University of Denver, brought an employment discrimination claim under Title IX against DU as well as several faculty and staff members. Following discovery, the defendants moved for summary judgment. The district court granted the motion for summary judgment, concluding Throupe had not presented a prima facie claim of employment discrimination based on his sex.

We affirm the district court's grant of summary judgment. Specifically, we conclude the district court did not err in concluding that Throupe failed to raise a triable issue of fact as to whether he was discriminated against on the basis of his sex.

## I. Background

### *A. Factual Background*

Ronald Throupe came to the Burns School of Real Estate and Construction Management within DU as an Associate Professor in 2007. Since his arrival, Throupe's research and teaching has focused on real estate, specifically appraisal, investments, and real-estate software. Historically, he received positive reviews for his teaching and research and was promoted to a tenured position in 2013. During his time at DU, he has maintained a private real estate consulting practice.

In 2013, Throupe was a candidate to serve as director of the Real Estate and Construction Management department. DU ultimately hired outside of the

school, bringing in Barbara Jackson to lead the department. Jackson's scholarship focuses on construction management. According to Throupe, upon Jackon's arrival, she quickly "announced her intention of significantly reducing the real estate portion of the school." Aplt. App. 377. Jackson made this clear in conversations with professors, indicating she would force some of the tenured real estate faculty members to leave.

In May of 2014, Throupe attended a gala hosted for Burns faculty with a former student, Mao Xue. Xue is a Chinese national who had graduated with an MBA from DU in 2013. Both before and after the gala, Throupe maintained a close personal and professional relationship with Xue. During her time at DU, Xue served as a research assistant to Throupe and took much of her course work from him. Outside of school, Xue worked for Throupe, spent extensive time with his family, traveled with him for conferences, and was on his family's cell phone plan. Throupe variously described his relationship with Xue as "step-dad," "father-daughter," and "sister-daughter." *Id.* at 176, 193, 196. After the events described here, he adopted her.

Prior to the gala, Defendant Marie Kline, an administrator within Burns, told Throupe he would need to pay for Xue's ticket. Kline indicated to Throupe that the gala was customarily free only for faculty, staff, and their significant others. According to Kline, Throupe then "told me [Xue] was his significant

other." *Id.* at 997. Throupe acknowledges saying as much, but insists this statement was taken out of context.

After the gala, staff, faculty, and students within Burns began expressing concerns to one another and Jackson about an inappropriate relationship between Throupe and Xue. Some speculated they were having an affair. And some said they had seen Throupe and Xue holding hands and being otherwise physically affectionate. Throupe recalls four occasions on which these rumors made it back to him. In the summer of 2014, one professor told Throupe that "everyone thinks that you and Mao are together." *Id.* at 175. At an academic conference in May of 2015, another professor, Defendant Glenn Mueller, told Throupe he had heard Throupe had left his wife to be with Xue. In June of 2016, Defendant Paul Olk, who serves as the Associate Dean of Burns, told Throupe he had been told that Throupe had introduced Xue as his wife at the gala. And Throupe also said another professor at some point made "a remark about hearing something about [his relationship with Xue]." *Id.* at 176.

After spending the prior year working for Throupe, Xue returned to DU as a Master's student in the fall of 2014. The following spring, she served as a graduate assistant to Throupe and took all of her course work with him. During that quarter, Xue stopped attending classes for several weeks and also failed to report for her work as a research assistant. In late April, Throupe contacted DU's

Director of International Student Services to express his concerns about Xue's immigration status given her poor attendance. Throupe subsequently met with the Director of International Student Services and the Director of Graduate Student Services to discuss his concerns. During this meeting, Throupe described his relationship with Xue. He said he "financially supported her, that she was very close with his wife and kids" and "he asked her to refer to him as her step-dad, and not her boss, because he didn't want anyone to get the wrong idea about their relationship." *Id.* at 196–97. Because of their personal intimacy, he also said that once Xue had stopped attending classes, he began frequenting coffee shops she regularly went to and questioning her friends in an effort to find her.

Based on this meeting, each Director contacted DU's Title IX investigator to express concerns about Xue. When administrators reached out to Xue, she told them "I'm fine." *Id.* at 229. The Directors also informed Jackson about the meeting. Jackson then met with Throupe in early May. After this meeting, she contacted Associate Dean Olk and the Dean of Burns. In an email to both deans, Jackson wrote "[t]here's a serious issue with Ron Throupe." *Id.* at 1051. She said Throupe "is fully aware of everyone's concern about this relationship but constantly retorts that he's like a step-father to [Xue]. His behavior is totally out of line and now apparently something has happened in the relationship." *Id.* She concluded, "Ron believes he has done nothing but help this girl, but his behaviors

have been totally unprofessional and inappropriate, his father/daughter views perverted, and his obsession out of control." *Id.*

The Title IX investigator and DU's Manager of Equal Employment had a follow-up meeting with Throupe in early June. At this meeting, Throupe again described his relationship with Xue. He also expressed that he and Xue "don't feel safe in Burns anymore. We feel rumored." *Id.* at 176. After the meeting, he sent an email to the Manager of Equal Employment formally reporting a hostile work environment. When Throupe later asked whether any actions had been taken in response to his report, the investigator told Throupe his claim "did not result in any formal investigation by the Office of Equal Employment." *Id.* at 234.

In the fall of 2015, Jackson emailed Human Resources, asking whether Throupe had been told to cease his interactions with Xue. Human Resources told Jackson that it had not communicated with Throupe because it had not found any policy violations warranting formal action. Jackson then reached out to Olk and together they decided Throupe should not have any ongoing professor-student relationship with Xue. Olk issued Throupe a written warning in November of 2015, stating "the College is unable to allow you to continue your relationship with Ms. Xue related to her student status at this University," and "you should not interact with Ms. Xue or any other students in a manner that creates a conflict in

your role as a faculty member at the University." *Id.* at 324. The letter went on to explain "it would be extremely difficult for you to evaluate Ms. Xue impartially." *Id.* at 323. And it ended by laying out the path forward: "any failure to stop interacting with Ms. Xue immediately related to University business of any kind will result in further disciplinary action, up to and including termination of your employment." *Id.* at 324.

Throupe maintains that Jackson continued to harass him even after the written warning. Specifically, Jackson assigned Throupe unfavorable course schedules in both 2016 and 2017, resulting in more teaching preps and less desirable class assignments. At the same time, she gave more favorable course schedules to other male faculty members within the department. Throupe also recalled a scheduling meeting in 2017 during which Jackson yelled at Throupe.

### *B. Procedural Background*

In September of 2017, Throupe initiated a sex discrimination suit under Title IX of the Education Amendments Act of 1972 against DU, Jackson, Olk, Kline, and Mueller.[1] Throupe's complaint also included state law claims for defamation and intentional infliction of emotional distress. After discovery ended, the defendants brought a motion for summary judgment, claiming Throupe

[1] Xue initially was a party to the suit, but she filed a stipulated motion for dismissal with prejudice prior to summary judgment.

had failed to raise triable issues on all his claims. In his response, Throupe argued "[w]hen Defendant Jackson arrived as chair, she announced her intention of significantly reducing the real estate portion of the school" and "[f]rom that ensued a campaign to make Throupe leave." *Id.* at 377. According to Throupe, Jackson used his relationship with Xue as a pretext for advancing her departmental agenda.

The district court granted summary judgment for the defendants. Although Throupe had dedicated little space in his briefing to arguing any theory of sex discrimination, the district court identified two theories of sex discrimination in Throupe's argument: that the defendants created a hostile work environment and engaged in disparate treatment against him. But the court determined that Throupe had failed to establish a prima facie case of sex discrimination under either of these theories. Having dismissed Throupe's sole federal claim, the district court declined to consider the remaining state law claims due to lack of subject-matter jurisdiction.

## II. Analysis

### *A. Standard of Review*

We review a district court's grant of summary judgment de novo, applying the standard articulated in Federal Rule of Civil Procedure 56(a). Under Rule 56(a), summary judgment is proper if the record shows "there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020) (internal quotation marks omitted). A dispute is genuine "if there is sufficient evidence so that a rational trier of fact could resolve the issue either way." *Id.* (internal quotation marks omitted). "In determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the nonmoving party." *Id.* (internal quotation marks omitted). Also, if the plaintiff fails to provide sufficient evidence supporting a necessary element of his claim, the movant is entitled to summary judgment as a matter of law. *See Celotex Corp v. Cattret*, 477 U.S. 317, 322–23 (1984).

***B. Legal Standards***

1. Title IX

Title IX of the Education Amendments Act of 1972 prohibits discrimination "on the basis of sex" in educational programs or activities receiving federal funding. 20 U.S.C. § 1681(a). This includes employment discrimination in federally funded educational programs. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017).

Title VII of the Civil Rights Act of 1964 also prohibits an employer from discriminating against any individual "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, a plaintiff can prove discrimination

in several different ways, including proof of a hostile work environment or disparate treatment. Though Throupe has not brought any claims under Title VII, "[c]ourts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001). We do so here.

2. Burden-shifting Framework

We apply the familiar *McDonnell Douglas* burden-shifting framework when assessing a motion for summary judgment on a claim of sex discrimination. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972)). Under the *McDonnell Douglas* framework, the plaintiff has the burden of presenting a prima facie case of discrimination. *Id.* The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* Summary judgment will be granted if the plaintiff cannot prove the employer's articulated reasons are pretextual. *Id.*

3. Hostile Work Environment

A hostile work environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat. R.R. Passenger Corp. v. Morgan*, 531 U.S. 101, 117 (2002). To overcome summary judgment on this claim, the plaintiff must show (1) he was discriminated against

because of his sex, and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of his employment. *Sanderson*, 976 F.3d at 1174. An employer can be held liable if its employees create a hostile work environment and "it knew or should have known about the conduct but failed to stop it." *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018).

To maintain a claim under Title VII, the plaintiff must demonstrate that he was discriminated against because of a protected status, like sex. The plaintiff's sex need only be a "motivating factor" in the unlawful employment practice. 42 U.S.C. § 2000e-2(m). To show the defendant was motivated by the plaintiff's sex, a plaintiff may point to acts of harassment that are "facially sex based." *Sanderson*, 976 F.3d at 1174. Also, facially sex-neutral conduct can "support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *Id.* If a jury could reasonably infer the conduct was related to the plaintiff's sex, "then it is for the fact finder to decide whether such an inference should be drawn." *Id.* While it is generally the jury's role to determine if such acts were based on the plaintiff's sex, *id.*, summary judgment is appropriate if the plaintiff has not presented a triable issue of fact about the defendant's motive.

A plaintiff can also state a sufficient claim if he presents evidence that the discrimination was motivated by his "failure to conform to stereotypical gender norms." *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 711 (10th Cir. 2012) (internal quotation marks omitted); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion) (recognizing that "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part" but "stereotyped remarks can certainly be evidence that the employer actually relied on gender in making its decision").

Beyond evidence of the defendant's motive, the plaintiff must offer evidence that the defendant's conduct was so severe or pervasive as to alter the terms or conditions of employment. Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim. *Lounds*, 812 F.3d at 1222. To make this determination, we look to the "totality of the circumstances" and "consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

We assess this element both objectively and subjectively. It is not enough that the plaintiff perceived the conduct to be severe or pervasive. Rather, the

plaintiff must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Sanderson*, 976 F.3d at 1176. So, "the run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris*, 666 F.3d at 664. And "a few isolated incidents" of discriminatory conduct does not make the harassment pervasive. *Id.* at 666.

Again, whether the conduct was severe or pervasive is typically a question for the jury, but we can affirm a district court's grant of summary judgment when the plaintiff fails to make this showing. *See, e.g.*, *id.*

4. Disparate Treatment

To overcome summary judgment on a claim of disparate treatment, the plaintiff must provide evidence that (1) the victim belongs to a class protected by Title VII, (2) the victim suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).

An adverse employment action "is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hiatt*, 858 F.3d at 1316 (internal quotation marks omitted). But a "mere

inconvenience or an alteration of job responsibilities does not qualify as an adverse action." *Id.* (internal quotation marks omitted).

For the third element, a plaintiff can raise an inference of discrimination by showing differential treatment. For example, it is sufficient to show that the employer treated the plaintiff differently from similarly situated employees who are not part of the plaintiff's protected class. *Id.* at 1318. An employee is similarly situated if he "shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history." *Id.*

### *C. Analysis*

Our analysis begins and ends at the first step in the *McDonnell Douglas* framework. Summary judgment is appropriate on Throupe's claim if he cannot establish each of the elements for a prima facie case of either of his theories of discrimination. Here, he has failed to raise a triable fact about whether the defendants discriminated against him because of his sex. This failure sinks both his hostile work environment and disparate treatment claims. Moreover, for his hostile work environment claim, Throupe has not shown that any of the alleged discrimination was severe or pervasive.

1. Hostile Work Environment

Throupe identifies a handful of occurrences which he insists constitute a hostile work environment: the spreading of rumors about his relationship with Xue, being subjected to a Title IX investigation, receiving the written warning, being assigned a less desirable teaching schedule, and being yelled at by Jackson on at least one occasion. Of this conduct, only the Title IX report appears to be facially sex-based.[2]

Throupe cites deposition testimony from Barbara Jackson to prove he was discriminated against because of his sex. When Jackson was asked why she felt she needed to report Throupe's behavior to the Title IX office, she said it was

---

[2] While rumors involving sexual conduct *may* be motivated by the plaintiff's sex, the mere fact that the rumors involve speculations about an affair does *not necessarily* lead to this inference. *See, e.g.*, *Duncan v. Manager, Dep't of Safety, City and Cty. of Denver*, 397 F.3d 1300, 1312 (10th Cir. 2005) (refusing to regard a letter alleging the plaintiff was having an affair was based on her sex because "the letter critiques both Ms. Duncan and Chief Michaud for the alleged affair rather than singling out Ms. Duncan on the basis of her gender"); *see also Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (concluding the plaintiff had not shown evidence of sex discrimination because rumors about an affair involved both a female employee and male superior and the talebearers were of both genders).

Although at least some of the rumors here involved speculation that Throupe and Xue were having an affair, Throupe has not provided any evidence supporting the inference that the rumors were motivated by his sex. Rather, the record indicates the rumors circulated because of his own characterizations of the relationship, *see, e.g.*, Aplt. App. 175 (calling Xue his "significant other" prior to the gala), and actions, *see, e.g.*, *id.* at 289 (spending all his time with Xue at a conference where it was customary for faculty to bring their spouses).

because "it's a male faculty member. It's a female student. And [the Title IX office] to me was the place that I knew to take . . . the concerns that were being brought to my attention." Aplt. App. 679. Throupe says the discriminatory intent could not be any clearer. He was reported for a Title IX violation because he is "a male faculty member." *Id.*

Throupe cherry-picks Jackson's statement and strips it of important context. Jackson made her statement when describing why she felt it was appropriate to report Throupe and Xue's relationship to the Title IX office. The mere fact that Jackson viewed Throupe's conduct as reportable does not support the inference that she discriminated against him based on his sex. Nothing in the record indicates Jackson would have treated any differently a female professor who maintained a deeply personal relationship with a male student. And Throupe's own counsel acknowledged during oral argument that it was appropriate to report Throupe initially for a Title IX investigation based on the way he described his relationship with Xue. *See* Oral Arg. at 15:00–15:30, *Throupe v. University of Denver, et al.* (2021) (conceding that "DU unequivocally had an obligation to investigate these concerns"). That Jackson described Throupe as a "male professor" in this context does not raise a triable issue of fact about the defendants' motivation.

Seeing the writing on the wall, Throupe tries to re-frame his argument as a claim of sex stereotyping. For the first time on appeal, he argues the defendants' actions were driven by a stereotypical vision of how a male professor should interact with his female students. First, we conclude that Throupe has forfeited this theory of sexual stereotyping. One would search in vain for any reference to a case supporting this theory in Throupe's briefing before the district court. We will not consider an argument that was not fully briefed and decided by the district court. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("It is the significant but limited job of our appellate system to correct errors made by the district court in assessing the legal theories presented to it, not to serve as a second shot forum where secondary, back-up theories may be mounted for the first time.") (internal quotation marks omitted and alterations incorporated).

Even if Throupe did not forfeit the stereotyping argument, this theory fails. Throupe insists "an older man was being targeted for false charges by his superiors based on a salacious and long-standing rumor about having an affair with a younger woman driven by stereotypical thinking about the 'proper roles' and conduct of men and women in the workplace." Aplt. Br. at 26–27. But this bald assertion does not relieve Throupe of the burden of citing evidence to support this theory. None exists here.

Throupe maintains deposition testimony from his colleague, Professor Mueller, supports his stereotyping theory. During his deposition, Mueller was asked whether he believed it was inappropriate for Throupe to constantly spend time with Xue at an academic conference. Mueller said he believed it was. But, Mueller said, he would not have viewed Throupe and Xue's conduct as inappropriate had Xue been a male student.

But Throupe, again, strips Mueller's statement of its context. Mueller was asked about the amount of time Throupe and Xue spent together at an academic conference. He explained it was customary for professors to bring their spouses to the conference. Given that background, he viewed it as inappropriate for Throupe to be spending all his time at the conference with a female student. It was the fact that Throupe and Xue were of opposite sexes—not that Throupe was a man—driving Mueller's perceptions. The only stereotyping defendants appear to have engaged in is about how *any* professor should interact with his or her students, particularly those of the opposite gender.

Without any evidence to support his assertion that the defendants discriminated against him because of his sex, none of the aforementioned sex-neutral conduct raises an inference that Throupe was treated a certain way because he is a man. The rumors were spread and Title IX investigation performed because of his own characterization of the relationship. The written

warning was premised on concerns about the professor-student dynamic at play, not the fact that Throupe is male. And, in Throupe's own words, he was mistreated because of Jackson's pedagogical vision for the department, not his sex. *See* Aplt. App. 377 ("When Defendant Jackson arrived as Chair, she announced her intention of significantly reducing the real estate portion of the school, which would have required firing at least five real estate professors . . . . From *that* ensued a campaign to make Throupe leave.") (emphasis added).

Though Throupe's failure to show that any discrimination was based on his sex would be enough to end our inquiry, we also agree with the district court that the conduct at issue was neither severe nor pervasive. We do not doubt that the defendants' actions must have been personally painful for Throupe. But none of the conduct Throupe identifies rises to the level of severity required for a hostile work environment claim. We have found conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances. *See, e.g.*, *Morris*, 666 F.3d at 667 (describing instances where we have found the element of severity met, including assault and the physical groping of body parts).

The problematic conduct Throupe points us to also does not raise a triable issue of pervasiveness. While rumors and speculations circulated from 2014 through 2016, Throupe was personally made aware of rumors about his relationship with Xue on only four occasions. The Title IX investigation required

Throupe to perform a single interview and his counsel conceded at oral argument that this was warranted. And he received the written warning, which did nothing to alter the terms or conditions of his employment. The warning simply informed Throupe he needed to stop engaging with Xue in a professor-student capacity due to concerns about the relationship compromising his impartiality as a teacher. These isolated incidents, viewed in the aggregate, do not raise a triable issue of pervasiveness.[3] *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (finding that five separate incidents of sexually-oriented, offensive comments over a sixteen month span was not pervasive). This is far from the "steady barrage" of discriminatory conduct necessary to establish pervasiveness. *Morris*, 666 F.3d at 666 (internal quotation marks omitted).

2. Disparate Treatment

Given our analysis above, we can quickly dispatch Throupe's disparate treatment claim. Throupe has failed to raise any inference of discrimination. He

---

[3] While we must consider the entirety of the record in making this determination, we do not simply have to accept Throupe's claim that all the discriminatory conduct he identifies was part of the same hostile work environment. "To determine whether these acts are part of the same hostile work environment . . . [we look] at the type of these acts, the frequency of the acts, and the perpetrator of the act." *Duncan*, 397 F.3d at 1309. Here, Throupe has not provided any evidence linking the scheduling conflicts to his relationship with Xue or his sex. Furthermore, Throupe was not singled out for this unfavorable scheduling. As Throupe himself acknowledges, such actions were part of a larger initiative by Jackson to push real estate professors out of the department.

has provided no evidence that a similarly-situated female professor would be treated differently. Rather, the record reflects that Throupe had male colleagues within the department who were also treated poorly in an effort to make them leave. But he also had male colleagues who were given more favorable assignments by Jackson. Without any evidence raising an inference of sex discrimination, Throupe's disparate treatment claim must fail.

## III. Conclusion

Not all offensive or hurtful conduct within the workplace is actionable under Title VII or Title IX. Throupe has not provided any evidence that he was singled out for mistreatment because of his sex. And his own theory of the case before the district court—that he was targeted due to departmental politics—belies this claim. Accordingly, we affirm the district court's decision to grant summary judgment.

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

February 26, 2021

Ms. Cassandra M. Kirsch
Cassandra M. Kirsch Law Office
600 Seventeenth Street, Suite 2800-S
Denver, CO 80202

Mr. Nathaniel B Smith
Nathaniel B. Smith Law Office
225 Broadway, Suite 1901
New York, NY 10007

**RE: 20-1069, Throupe v. University of Denver, et al**
Dist/Ag docket: 1:17-CV-02293-MSK-NRN

Dear Counsel:

Attached is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of the Court

cc: Jim Goh
Erin R Mangum
Renee J. Sheyko

CMW/at